20 So.3d 1061 (2009)
Daisy Vining RICHARD
v.
Shawn Jaimie RICHARD.
No. 2009 CU 0299.
Court of Appeal of Louisiana, First Circuit.
June 12, 2009.
*1063 Peter B. Sloss, Emily Stevens Hardin, New Orleans, Counsel for Plaintiff/Appellant Daisy Vining Richard.
Lisa Leslie Boudreaux, Baton Rouge, Counsel for Defendant/Appellee Shawn Jamie Richard.
Before: KUHN, GUIDRY, and GAIDRY, JJ.
GUIDRY, J.
A mother appeals a judgment in which the trial court transferred domiciliary custody of the child to the father.

FACTS AND PROCEDURAL HISTORY
The parties to this matter, Shawn Jamie Richard and Daisy Vining Richard, were married in 1996, and established their matrimonial domicile in Thibodaux, Louisiana. In 2003, the couple adopted a three-year-old boy from a Ukraine orphanage, whom they named August. Eight months after August's adoption, Shawn and Daisy separated, but continued to reside together for three months until Shawn moved to New Orleans with his partner, Tom Landry. A *1064 petition for divorce was filed by Daisy on June 18, 2004, and the marriage was terminated by a judgment signed on January 21, 2005.
In regards to the custody of August, initially following the couple's separation and the filing for divorce, the couple agreed to a consent judgment, rendered on November 10, 2004, wherein the couple was granted joint custody of August with Daisy being designated the domiciliary parent. The consent judgment further outlined a schedule of visitation and support payments. The November 10, 2004 consent judgment remained in effect following the parties' divorce.
In April 2007, Shawn filed a "Petition to Modify Custody, Child Support and Other Incidental Relief," wherein he averred that in August 2005, after Hurricane Katrina struck New Orleans, he relocated to North Carolina. According to the petition, Daisy agreed to allow Shawn to exercise physical custody of August for the entire summer of 2006, since Shawn's relocation limited his ability to exercise visitation in conformity with the alternating weekend schedule outlined in the November 10, 2004 consent decree; however, despite having exercised physical custody of August for the entire summer, Shawn still paid child support to Daisy for that time period. Shawn further averred that given the fact he had relocated out of state and was "no longer able to exercise frequent and continuing contact with the minor child," he requested that Daisy again allow him to exercise physical custody for the entire summer of 2007, but Daisy no longer agreed with that arrangement. Shawn therefore sought modification of the custody and support awards of the November 10, 2004 consent decree, citing the fact of his relocation and Daisy's remarriage and pregnancy as some of the material changes in circumstances requiring the modification. At the hearing on the petition to modify custody, held June 11, 2007, the parties submitted evidence and entered a stipulation into the record, after which the trial court recessed the case to June 14, 2007. On June 14, 2007, the trial court ordered the submission of a consent judgment, which was signed by the trial court on September 12, 2007.
That same month, September 2007, Shawn moved back to New Orleans, and on February 22, 2008, Daisy filed a "Motion to Change Custody/Visitation and Set Child Support," on the basis that Shawn had moved back to Louisiana. Also pursuant to that motion, she sought to have the trial court address other issues raised in the prior hearing that were pretermitted to allow the parties an opportunity to reach an amicable resolution of those issues, which issues included modification of child support. In response to Daisy's motion, Shawn filed a reconventional demand in which he agreed that the prior custody decree needed to be modified for the reasons asserted by Daisy in her motion and for additional reasons set forth in his reconventional demand.
In his reconventional demand, Shawn asserted that he had "recently become aware of information that has caused him grave concern for the safety of his son while [his son] is [in] the actual physical custody of Daisy. It was alleged that the "grave concern" was based on Shawn's discovery that a "Petition for Protection from Abuse" had been filed against Andy Bergeron, Daisy's husband, in June 2006, wherein it was alleged that Andy had physically abused his teenage son from a prior relationship. The petition for protection was later dismissed following Andy's voluntary surrender of parental rights to his son.
The reconventional demand also listed a break down in communications between *1065 Shawn and Daisy and concerns regarding Daisy's adherence to August's prescribed medical treatment and appointments as additional justification for finding a material change in circumstances warranting modification of the existing custody decree.
In conjunction with the filing of the reconventional demand, Shawn requested that the trial court issue an interim order granting him temporary, sole custody of August, or in the alternative, to allow him to maintain actual physical custody of August "at any and all times in which [Daisy] is unable to do so as a result of her nighttime work schedule or when the minor child would be in the sole control and/or custody of Andy." This request was denied by the trial court. Additionally, because modification of custody was contested, Shawn requested that the trial court issue an order requiring the parties and August to submit to a mental health evaluation pursuant La. R.S. 9:331. The trial court appointed Jeanne Robertson, PhD, a licensed professional counselor and marriage and family therapist, educator, and custody evaluator, to evaluate the parties.
Subsequent to filing his reconventional demand, Shawn filed a rule seeking to have Daisy cited for contempt of court for preventing him from filing his 2007 income tax return based on Daisy's failure to execute documentation allowing him to claim August for 2007 as required in the September 12, 2007 consent decree. Shawn further alleged that Daisy had claimed August on her 2007 income tax return, in violation of the September 12, 2007 consent decree, and therefore he requested that Daisy be ordered to amend her 2007 income tax return so that he might claim August. Shawn also requested that Daisy be ordered to pay the attorney fees and court costs incurred as result of the filing of the rule.
A trial on the cross demands for modification of child custody, visitation, and support was held on August 14-15, 2008, following which the trial court found "there has been a substantial change in circumstances materially affecting the welfare of the child." Pursuant to this finding, the trial court maintained the award of joint custody to the parties, but modified the designation of domiciliary parent to designate Shawn as domiciliary parent, with reasonable visitation being awarded to Daisy of alternating weekends and major holidays and one month during the summer. The trial court further decreed that Daisy pay Shawn monthly child support and that the parties share the costs for medical insurance; medical, dental, and prescription expenses not covered by insurance; and childcare for August by a ratio of 76 percent to Shawn and 24 percent to Daisy. Daisy's motion to retroactively modify the prior child support award was denied and Shawn's rule for contempt was pretermitted pursuant to Daisy being required to "pay Shawn a sum of money equal to the difference between Shawn's State and Federal income tax liability for 2007 with and without his claiming the minor child as a dependent." A written judgment and a joint custody plan incorporating these rulings were signed by the trial court on November 5 and 25, 2008, respectively.

ASSIGNMENTS OF ERROR
In appealing the custody decree of the trial court, Daisy raises the following assignments of error:
1. The trial court's misapplication of the burden of proof resulted in legal error.
2. The trial court was manifestly erroneous in disregarding the Appellee's open homosexual lifestyle and several [La. C.C.] art. 134 factors when considering *1066 what was in the best interest of the minor child, August Richard.
3. The trial court was manifestly erroneous in finding that Appellee had met his burden of proving a change in circumstances that materially affected August's welfare, when there was a) no expert testimony concerning August's needs, b) no evidence concerning the suitability of Appellee's domestic partner, Tom Landry, to care for August, and c) no evidence whatsoever that Andy Bergeron poses any risk to August.
4. The court was manifestly erroneous in refusing to recalculate Appellee's child support obligation due to a change in Appellee's income and in failing to order a retroactive payment of child support to Appellant.

DISCUSSION
In her first assignment of error, Daisy alleges that the trial court misapplied the burden of proof in deciding custody based on certain statements made by the trial court in its reasons for judgment. We disagree with Daisy's representation of the trial court's statements.
In explaining how "burden of proof applies in a civil matter, the Louisiana Supreme Court articulated the following:
Generally, the legal term "burden of proof "denotes the duty of establishing by a fair preponderance of the evidence the truth of the operative facts upon which the issue at hand is made to turn by substantive law." Black's Law Dictionary (8th ed). Under Louisiana's civil law, the "burden of proof may shift back and forth between the parties as the trial progresses. Therefore, when the burden of proof has been specifically assigned to a particular party, that party must present sufficient evidence to establish the facts necessary to convince the trier of fact of the existence of the contested fact. Stated another way, the party on which the burden of proof rests must establish a prima facie case. If that party fails to carry his burden of proof, the opposing party is not required to present any countervailing evidence. On the other hand, once the party bearing the burden of proof has established a prima facie case, the burden then shifts to the opposing party to present sufficient evidence to overcome the other party's prima facie case. Louisiana courts commonly apply this "shifting burden of proof in numerous specific instances, such as trial on motions for summary judgment and exceptions, and in workers' compensation cases.
Landiak v. Richmond, 05-0758, p. 8 (La.3/24/05), 899 So.2d 535, 542.
There is a distinction between the burden of proof needed to change a custody plan ordered pursuant to a considered decree and that needed to change a custody plan ordered pursuant to a non-considered decree (or stipulated judgment). Elliott v. Elliott, 05-0181, p. 8 (La.App. 1st Cir.5/11/05), 916 So.2d 221, 227, writ denied, 05-1547 (La.7/12/05), 905 So.2d 293. If a prior award of custody, as in this case, has been made by consent decree, the party seeking a change in custody must prove that a change materially affecting the welfare of the child has occurred since the original decree. The proponent for change must also show that the proposed modification of custody is in the best interest of the child. MacHauer v. Randolph, 99-0086, p. 3 (La.App. 1st Cir.9/24/99), 754 So.2d 1042, 1043. As the proponent of the request to modify the parties' domiciliary status under the existing consent decree, Shawn bore the burden of proof on this issue. See Hensgens v. Hensgens, 94-1200, pp. 6-7 (La.App. 3d Cir.3/15/95), 653 So.2d 48, 52.
*1067 In finding that Shawn proved the first factor for establishing a modification of custody, the trial court stated the following:
I believe that Shawn[,] in presenting the petition or the motion . . . presented to the Court a change of circumstances that materially affected the welfare of the child. . . . [H]e finds out about what happened with Andy Bergeron in Terrebonne Parish and the allegations that were made. And his testimony about the other issues, the words that his son was speaking to him about whipping your a* * and hearing that on two occasions and hearing from his son that it came from Andy and finding out about the other incident or the allegations against Mr. Bergeron in Terrebonne Parish, those are certainly circumstances that materially affect the welfare of August. I don't think anybody could argue with that.
So, I think at least at that point he has sustained that part of his burden of proof that there were materialthat there was a change and the change is that Daisy is married to Andy Bergeron. They have a household, a family, and that Mr. Bergeron has been accused of abusing his child. And, certainly, that's an issue that materially affects August Richard's well-being. I don't think there's any question about that.
The trial court then went on to discuss those facts that supported its finding that it was in the best interest of the child to designate Shawn as domiciliary parent, the correctness of which we will review in discussing Daisy's second and third assignments of error. Nevertheless, Daisy takes issue with the following statement made by the trial court in discussing the fact of Shawn's sexual orientation:
But I don't consider that to be a factor in this case for several reasons. Number one, it wasn't briefed, and number two, I think if it was going to be a factor, then it was imperative on Daisy to bring evidence to this Court to show that aside from all other factors, that the mere fact that Shawn is a homosexual and lives in a relationship with another man that that fact alone would be detrimental and for that reason it would not be in August's best interest to live there. And I think the burden is on her to prove that, and there's certainly no evidence presented to suggest that.
As previously stated, as the proponent of the request for modification of custody, Shawn had the burden of proving (1) a material change in circumstances affecting the welfare of the child; and (2) that the proposed modification would be in the best interest of the child. Once Shawn made a prima facie case of establishing these two factors, as will be discussed later in this opinion, the burden shifted to Daisy to present countervailing evidence sufficient to overcome Shawn's prima facie showing. Moreover, it is an elementary rule of law that one who asserts a fact must carry the burden of proof of that fact and the fact must be established by a reasonable preponderance of the evidence. Meyer v. State, Dept. of Public Safety License Control and Driver Improvement Division, 312 So.2d 289, 292 (La.1975). Thus, considering the foregoing legal principles, we reject Daisy's assertion that legal error was committed because the trial court misapplied the burden of proof.
In her third assignment of error, Daisy specifies three grounds for asserting that the trial court erred in finding that Shawn had sufficiently proven a material change in circumstances to justify modification of the existing custody decree: (a) there was no expert testimony concerning August's needs; (b) there was no testimony regarding the suitability of Tom Landry, Shawn's *1068 partner, as a caregiver for August; and (c) there was no evidence that Andy poses a risk to August.
In this case, and as in most child custody cases, the trial court's determination was based heavily on factual findings. It is well settled that an appellate court cannot set aside a trial court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. Elliott, 05-0181 at 7, 916 So.2d at 226-227. If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. R.J. v. M.J., 03-2676, p. 5 (La.App. 1st Cir.5/14/04), 880 So.2d 20, 23. In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Elliott, 05-0181 at 8, 916 So.2d at 227.
Based on our review of the record before us, we find that there was evidence of an expert quality presented to the trial court concerning August's needs. As previously mentioned, Dr. Robertson was appointed to evaluate the parties on April 4, 2008, and in conjunction with her evaluation, she interviewed Shawn, Daisy, Andy, Tom, Monique Omer (Shawn's sister), Jeffrey Waalk (Andy's teenage son to whom he relinquished his parental rights), Melanie Waalk (Jeffrey's mom), and August. Dr. Robertson also observed August's interactions with family members on two separate occasions: first with Daisy, Andy, and their infant daughter, Amelia; and second with Shawn and Tom. Dr. Robertson additionally consulted with Dr. Jason Wuttke, August's treating psychiatrist, and Arian Elfant, PhD, a clinical psychologist who performed a psychoeducational evaluation of August, at Shawn's request, for the purpose of private school admission. She also reviewed various documentary evidence, including the pleadings filed in the instant matter.
The trial court, in its reasons for judgment, expressly found that Shawn proved the first factor for seeking modification of the September 12, 2007 consent decree through his presentation of evidence that a protective order and criminal charges had been filed against Andy alleging that he physically and emotionally abused his teenage son from a previous relationship. Having reviewed the evidence, we cannot say that the trial court was clearly wrong in finding that Shawn had established a material change in circumstances based on this evidence alone. Proof of the parties' failure to communicate regarding such significant issues as changing residences (both Shawn and Daisy failed to notify the other that they were changing residences until after they had moved) and Shawn's relocation back to Louisiana were additional facts that supported the trial court's finding of a material change in circumstances to justify modification of the existing consent decree.
Nevertheless, we will still address the additional grounds raised by Daisy in challenging the finding that a material change in circumstances existed, but we observe that the challenges raised by Daisy appear more so to be challenges of the trial court's finding that it was in the best interest of August to designate Shawn the domiciliary parent. Therefore, in conjunction with Daisy's second assignment of error, in which she alleges that the trial court disregarded Shawn's "open homosexual lifestyle" and several factors under La. C.C. art. 134 when it made its best interest of the child determination, we will also *1069 consider the specific grounds raised by Daisy in challenging the finding of a material change in circumstances.
Every child custody case must be viewed in light of its own particular set of facts and circumstances. Elliott, 05-0181 at 7, 916 So.2d at 226. Louisiana Civil Code article 131 provides that the paramount consideration in any determination of child custody is the best interest of the child. R.J., 03-2676 at 5-6, 880 So.2d at 23. Thus, the trial court is in the best position to ascertain the best interest of the child given each unique set of circumstances. Accordingly, a trial court's determination of custody is entitled to great weight and will not be reversed on appeal unless an abuse of discretion is clearly shown. Elliott, 05-0181at 7, 916 So.2d at 226.
In determining the best interest of the child, La. C.C. art. 134 directs the court to consider all relevant factors, which may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
Daisy's first contention, in her third assignment of error, was that there was "no expert testimony concerning August's needs." Dr. Robertson, as well as Dr. Elfant, found that "August needs a comprehensive neurological and psychological and/or psychiatric evaluation" and that "[t]he presence of additional psychological/psychiatric disorders or concerns should also be ruled out." However, we do not find that the conclusion that further testing and examination is needed to definitively address August's educational and psychological needs invalidates or discredits Dr. Robertson's or Dr. Elfant's opinions regarding the needs of August deduced on the psychological and psychiatric evidence that was available, as well as their own personal observations and research. And while the trial court acknowledged that Dr. Robertson does not "pretend to be an educational specialist" or "child psychologist," based on Dr. Robertson's experience and educational background and other evidence, such as Dr. Elfant's psychoeducational test report, presented to the trial court, we cannot agree with Daisy's representation *1070 that "no expert testimony concerning August's needs" was introduced at trial.
We likewise disagree with Daisy's allegation that "no evidence" was presented concerning Tom's ability to act as a caregiver for August. As noted by the trial court:
Over the years that I've been doing this, I've had many people testify in this courtroom about their mamma being a baby-sitter or they're taking their child to daycare or they're taking their child to some lady around the corner, and not everybody who provides daycare for a child or provides supervision for a child has to come into the courtroom and testify in order for that party to further their request for custody.
So, yes, maybe it would have been nice to hear from Mr. Landry, but the fact that he didn't testify, basically, the evidence presented by Shawn Richard on that point and his role in August's life is uncontradicted, is basically where it's left. There's no evidence to say that Tom Landry should not provide supervision and care for August. It's uncontradicted.
It is also observed that Tom was interviewed by Dr. Robertson in connection with her custody evaluation of the parties. And although Dr. Robertson did not testify at trial, she was deposed by the parties and thoroughly questioned regarding the observations and the conclusions reached in her custody evaluation report. Her deposition and custody evaluation report were introduced into evidence at trial. Notably, Dr. Robertson recounted the following regarding her observation of the interaction between August, Shawn, and Tom:
August was observed on a separate occasion with his father Shawn and his partner Tom Landry. They all sat on the floor. Play and verbal interaction were constant. Shawn and Tom both focused their attention on August. There was some verbal interaction between Shawn and Tom, but it was extremely limited. As they played with August, they guided and taught him about how things operated. They helped August devise extensive scenarios involving Legos, pirates, etc. August was asked how he wanted things; he was encouraged to choose and direct the play.
August interacted and played with both his father and Tom. There was a great deal of laughter. August was clearly relaxed and comfortable. There was constant verbal and eye contact between Shawn and August. August responded frequently.
Thus, we find adequate evidence of Tom's ability to act as a caregiver was presented to the trial court.
As for Daisy's assertion that "no evidence whatsoever" was presented that Andy poses any risk to August, we again must disagree with her assessment of the evidence. According to the evidence and testimony presented at trial, Andy and Daisy met "online" through an internet dating service in November 2005, and they met in person in January 2006. In August 2006, the couple began living together and married on November 10, 2006. In June 2006, however, Melanie Waalk, the mother of Andy's then fourteen-year-old son, Jeffrey, filed a "Petition for Protection from Abuse" against Andy, alleging that on Father's Day, Andy had physically and verbally abused Jeffrey while Jeffrey was visiting at the home of Andy's parents. A protective order was issued against Andy and he was criminally charged with domestic abuse/simple battery; however, before the matter went to trial, the charges were dismissed in exchange for Andy voluntary surrender of his parental rights to Jeffrey. *1071 Although Daisy knew of these proceedings, she did not inform Shawn.
Jeffrey and Freddie Bergeron, Andy's father, both testified at trial. Jeffrey testified that when Andy arrived at his parents' home on Father's Day 2006, Andy sought him out and found him reading a book about Marilyn Manson and possibly listening to the artist's music. Andy and Jeffrey argued about Jeffrey's preference in musicians, which Andy acknowledged; however, Andy denied Jeffrey's further account that he pushed and punched Jeffrey and called Jeffrey derogatory names after dragging Jeffrey outside during their argument. Although Andy's father, Freddie, denied hearing Jeffrey and Andy argue or seeing any evidence of Andy's physical abuse of Jeffrey, he did corroborate Jeffrey's testimony that when Jeffrey re-entered the house, he was crying and that Jeffrey told him that Jeffrey and Andy had been arguing.
In the reconventional demand filed by Shawn, wherein Shawn requested that he be designated the domiciliary parent, he alleged that he had "recently become aware" of the domestic abuse proceedings filed against Andy. At trial, Shawn testified that on learning of the proceedings, he went to Terrebonne Parish to review the record of the proceedings. After reviewing the record and further speaking with Melanie Waalk, Jeffrey's mother, he then realized that some of the troubling behavior that August had been exhibiting might be due to his interactions with Andy. Specifically, Shawn testified he believed that Andy could possibly be subjecting August to some of the same abusive behavior as he had been accused of inflicting on his son Jeffrey because August had developed a facial tic, had begun stuttering, and on at least two occasions had used the expression "I will whip your a* *" when reprimanded. In the domestic abuse pleadings, it was reported that Andy had used such threatening words toward Jeffrey. Shawn stated that August told him that Andy used the phrase when Shawn questioned August about his use of the threatening phrase. Shawn said Daisy denied that Andy used such language when Shawn questioned her about August's disclosure.
Shawn further testified that August's facial tic was so pronounced that Daisy's parents called him on New Year's Eve 2007 and asked him to have August examined by Dr. Wuttke, even though Daisy had already had August examined by his treating pediatrician and the pediatrician had stated that the facial tic could be a side effect of August's medications. In a subsequent examination, Dr. Wuttke also opined that August's facial tic could be a side effect of his medication. When questioned about the diagnosis given by both of August's treating doctors, Shawn observed that neither doctor was aware of the allegations of domestic abuse against Andy at the time. Shawn further testified that Dr. Wuttke had stated that it would be hard to determine if August was being abused because of possible defense mechanisms August may have developed as result of his experience of living in an orphanage in the Ukraine.
As for Dr. Robertson's observations of Andy's relationship with August, she recounted the following in her custody evaluation report:
As I entered the observation room, Andy was correcting August. The mother was sitting on the sofa holding Amelia who was asleep. Andy and August had been playing for awhile and there were a number of toys on the floor. August was instructed to pick them up and he was very cooperative.
. . .
There was frequent verbal communication among Daisy, Andy and August. *1072 The communication between Daisy and Andy was more often. August's verbalizations were extremely polite and respectful and seemed cautious. He appeared to want to please and may have been somewhat fearful of making a "wrong" response.
The level of affection shown toward Amelia by both Daisy and Andy was very strong. The level of affection shown toward August was less clear. He appeared to be secondary for both Daisy and Andy. The level of affection from August to his mother was okay. The level of affection from August to Andy was fair. He appeared to enjoy playing, but seemed slightly fearful.
No discipline was needed. However, both Andy and Daisy corrected him on several occasions. It was not clear what August had done to elicit that response.
. . .
August said his mother and dad (Andy) both cook. He said his mom gets "mad when I don't listen." He told me, "Dad (Andy) gets mad for the same thing." . . . He appeared to understand that he was punished at his mother's house frequently. . . .
August calls his father Papa. At his father's, "Papa and Tom both cook." They fix him cereal for breakfast. He said Papa and Tom do not get mad.
Considering the foregoing evidence, we find that it was sufficient to show that, to an extent, Andy has some adverse influence on August. While the evidence may be insufficient to establish that Andy poses an outright or substantial risk to August, it is sufficient to support a finding that August may have been harmed by some aspects of his relationship with Andy.
As for Daisy's concerns regarding the trial court's assessment of other factors outlined in La. C.C. art. 134, particularly the factor related to the moral character of the parties and Shawn's open homosexuality, we first should point out that the trial court did address this issue and the evidence, or lack thereof, of its affect on August, as previously discussed in reviewing Daisy's first assignment of error. Nevertheless, we recognize that in Scott v. Scott, 95-0816, pp. 8-9 (La.App. 1st Cir.12/15/95), 665 So.2d 760, 766, the following principles were pronounced for assessing what consideration should be given a parent's sexual lifestyle:
In assessing whether a parent's sexual lifestyle is cause for removing or denying custody, we must consider whether the behavior was damaging to the children. This involves a determination of (1) whether the children were aware of the illicit relationship, (2) whether sex play occurred in their presence, (3) whether the furtive conduct was notorious and brought embarrassment to the children, and (4) what effect the conduct had on the family home life.
In the matter before us, it appears that factor (4) is the most critical to a determination of the influence Shawn's homosexuality has on August. There is no question that August is aware of Shawn's homosexual lifestyle; however, the record does not reveal any evidence indicating whether Shawn and Tom engage in "sex play" in August's presence or whether August sufficiently appreciates the significance of Shawn's relationship to be embarrassed by it. Nevertheless, the evidence in this case clearly preponderates to a showing that despite Shawn's alternative lifestyle, August appears to be more comfortable and happy with his father and his partner than with his mom and her husband. Whether personal feelings and moral judgments would incline individuals to consider otherwise, absent evidence to the contrary, we must conclude that the trial court did not *1073 abuse its discretion in refusing to find that Shawn should not be designated domiciliary parent solely on the basis of his homosexuality.
Additionally, in considering the other factors outlined under La. C.C. art. 134, we find no merit in Daisy's assertion that because Shawn (who claims to be of the Catholic faith) does not attend services, he will neglect August's religious training in the faith.[1] Shawn testified that Tom has an uncle who lives in New Orleans and who is a priest, and that if he were designated domiciliary parent, he planned on enrolling August in catechism classes at the uncle's church.
Of greater importance in our review of the factors and the evidence presented in this record are two things. First, as noted by the trial court, based on Dr. Robertson's report and its own observations during trial, there is some genuine concern regarding Daisy's perception of and interaction with August. Dr. Robertson stated that Daisy acknowledged that August "is at the developmental level of a 5 year old with ADD and other significant problems. On the other hand, her expectations about his behaviors do not match these expressed perceptions; they far exceed his ability to comply." The trial court agreed with this finding, stating that "I agree with [Dr. Robertson's] conclusion that Daisy, as much as she loves and cares for August,. . . is [not] realistic about August's needs." The trial court went on to explain "I think that at this point that is not a good household for August Richard. Not because he's not loved, I don't think he's in danger, but I think there's something missing, and I think it's a combination of denial on Daisy's part and I think the rest of it is distraction.. .the other factors of being married and having another child I think has caused serious distraction, and that distraction has been reflected in the lack of communication with Shawn."
An incident that illustrates the trial court's concern regarding the deficiencies of Daisy's consideration of August's special needs and the need to prioritize his care occurred sometime around June 2008 when August killed a kitten while in Daisy's physical custody. Although it was disputed as to exactly when Daisy informed Shawn of the incident (Daisy testified she phoned Shawn the same day and Shawn testified that it was the day following), Daisy freely admitted that later that night when she got ready to go to bed, she placed her infant daughter in the room with her and Andy and locked their bedroom door because the incident frightened her. Despite her fright, Daisy did not immediately attempt to contact Dr. Wuttke, August's treating psychiatrist, about the incident. Once Dr. Wuttke was informed of the incident, he prescribed play therapy for August, which, due in part to the fact that the therapist that Dr. Wuttke prescribed for the treatment being located in New Orleans (where Dr. Wuttke also practices), Shawn attended most of the appointments with August.[2]
The other major factor demonstrated by the record that favors the trial court's decision to designate Shawn domiciliary parent was the issue of education. Based on testimony presented at trial, and Dr. Elfant's report, it was established that because of August's speech problems, diagnosis of ADHD, and other suspected educational *1074 and psychological problems, it was recommended that August attend a "first grade classroom, which provides instruction for students at a variety of levels, and provides a balance between learning that is hands on and learning that emphasizes the development of verbal skills would be optimal for August. He will likely benefit from an intimate, nurturing setting where he can receive adequate attention and support in how to navigate his difficulties focusing and attending."
Prior to selling her house and moving to Galliano, a distance that Shawn testified was an hour and a half longer ride from New Orleans, Daisy had lived in Thibodaux and August had attended St. Joseph's, a private Catholic school. As a consequence of her move, and as domiciliary parent, Daisy testified that she had enrolled August in Golden Meadow, a public school with an average class size of 24 to 25 students.[3] To show that her decision to enroll August in Golden Meadow was not bad decision, Daisy presented Charles Michel, supervisor of special education for the Lafourche Parish School Board, as a witness.
Dr. Michel was accepted by the trial court as an expert in the field of special education. Dr. Michel testified that through the use of "IEPs" (Individual Education Programs), he averred that a specialized curriculum could be designed to meet August's needs, even through the use of resources outside of the school system. Dr. Michel acknowledged that the student-teacher ratio for Golden Meadow was 24 or 25 students to one teacher, but he said if August's IEP dictated,[4] he would be placed in a classroom with inclusion support, which would mean another teacher or paraprofessional would be in his classes, thereby creating a student-teacher ratio of 24 or 25 to two, resulting ultimately in a ratio of 12 or 13 students to each teacher or paraprofessional.
Shawn, in turn, presented evidence of two highly specialized private schools, which met the requirements outlined by Dr. Elfant, that he was considering for August if he were designated domiciliary parent. One of the two schools that Shawn testified about was The Hill School, which was housed downstairs in the building in which Shawn and Tom lived. Shawn stated that The Hill School had done "wonderful things" for his landlord's son, who is autistic. He also said that the average class size for the school was about six to nine students.
Considering this evidence, we find that the record more than sufficiently supports the trial court's finding that it is in the best interest of August to designate Shawn the domiciliary parent. Hence, we find no abuse of the trial court's discretion and decline to disturb its modification of the parties' custody.
As for Daisy's final assignment of error, we note that the previous rule to modify the award of child support was filed by Shawn, and that the parties acquiesced in the trial court's decision to pretermit determination of that issue to allow the parties to reach an amicable resolution. Further, based on our determination that the trial court's decision to designate Shawn domiciliary parent should be affirmed, which means that the trial court's decree *1075 that Daisy is now liable for the payment of monthly child support to Shawn must also be maintained, we decline to give retroactive effect to the award of child support to the date of judicial demand, as this modification of the judgment would benefit Shawn, who did not appeal the November 5, 2008 judgment nor answer the appeal. See La. C.C.P. art. 2133.

CONCLUSION
Even though the parents compared equally in all but a few factors required to be considered in determining the best interest of the child, evidence that the father is better able to provide for the minor child's special educational and psychological needs; that the father has made a better effort than the mother in planning his life around those needs; and that the mother has less restraint and patience, due to distraction and a failure to fully appreciate the special needs of the child that could potentially hinder the child in his ability to overcome his special needs, support the father being designated domiciliary parent. We therefore affirm the judgment of the trial court. All costs of this appeal are cast to the mother, Daisy Vining Richard Bergeron.
AFFIRMED.
KUHN, J., Dissents and Assigns Reasons.
KUHN, J., dissenting.
It is undisputed that August has "special needs." At argument, the parties conceded that neither one could advise the court definitively what August's "special needs" are. For the trial court to have made a determination of the best interest of the child in this vacuum was impossible. Neither parent established the "special needs" of the child, and neither has shown that he or she can satisfy those needs. I would remand to have the trial court determine August's special needs and which parent could best satisfy them. To do otherwise is to ignore the paramount question in this litigationi.e., what is in the best interest of Augustwhich should first be addressed by the parents and then the court.
Moreover, given August's history of physical change in domicile at the age of three, I cannot envision how changing custody from the mother with whom he has lived the majority of his five years in the United States to every other weekend, major holidays, and one month during the summer can be in his best interest.
Accordingly, I dissent.
NOTES
[1] Daisy and Andy both testified that they are of the Catholic faith and attend services "most" Sundays.
[2] Following the cat incident and August's enrollment in play therapy, Shawn testified that Dr. Wuttke increased the frequency of his visits with August from once every three months to once a month. He also stated that August's play therapist had scheduled August for weekly sessions.
[3] Also in conjunction with her move to Galliano, Daisy went from being employed as a fulltime nurse at Thibodaux Regional Hospital, to only working at the hospital one day a month as needed, so she could stay at home and be the primary caretaker for August and Amelia. Andy testified at trial that he is a pilot and that he is employed for six months out of the year with a salary of around $30,000 per year. The remainder of the year, he said he planned to spend with his family.
[4] At the time of trial, the IEP for August had not been completed, although he was already attending Golden Meadow.