GUIDRY, J.
LAmanda Ellzey Bonnecarrere[1] appeals from a portion of a judgment of the trial court, awarding John P. Bonnecarrere, III custody of the minor children each year from September 1 until one week after the completion of the school year, and awarding Amanda custody of the minor children from one week after the completion of the school year until August 31 of each year and for the first seven days of the Christmas school holiday period. For the reasons that follow, we affirm.
FACTS AND PROCEDURAL HISTORY
Amanda and John were married on February 3, 2002, in Vernon Parish, Louisiana and later established a matrimonial domicile in Tangipahoa Parish, Louisiana. During the course of the marriage, the couple had two children.
On January 25, 2008, Amanda filed for divorce under La. C.C. art. 102 and requested that the court order joint custody of the two minor children, with Amanda being designated as the domiciliary parent and with John being granted liberal visitation at his parents’ home in Pearl River, Louisiana. On July 9, 2008, John filed a motion and order for visitation, requesting an order from the court ensuring that he would have visitation with the children while he was back in the country on military leave, and requesting that a hearing be set for the purpose of setting a permanent visitation schedule with the children.
A hearing on the issue of visitation was held on July 28, 2008. At the hearing, the parties entered into a stipulation, and in a September 12, 2008 judgment memorializing the parties’ stipulation, the trial court granted the parties joint custody of the two children, with Amanda being designated as the domiciliary parent, subject to visitation in favor of John. The judgment outlined specific holiday visitation on behalf of John for 2008 and also provided for *1229 John to have additional ^reasonable visitation to be agreed upon by the parties. Additionally, John was to have the children for two weeks in the summer. However, John was ordered not to remove the children from the jurisdiction of the court or the State of Louisiana. The judgment also detailed amounts to be paid by John monthly in child support.
On October 17, 2008, John filed a motion and order for reduction in child support and to set a visitation schedule. John asserted that he had moved to Pipestone, Minnesota, that his income had been altered considerably by the circumstances of his present employment, and that the child care expenses for his children had decreased. Because of these changes in circumstances, John requested a reduction in child support and also a modification of the visitation schedule to ensure that he had frequent and continuing contact with his minor children.
Thereafter, Amanda filed a rule to-show cause for a temporary restraining order and injunction and rule to show cause for restricted and supervised visitation.
Following a hearing on these issues, the trial court rendered and signed a judgment on March 30, 2009, maintaining joint custody of the children, with Amanda continuing to be designated as the domiciliary parent, subject to visitation in favor of John. The court maintained the visitation schedule as provided in the September 12, 2008 judgment, including the restriction that John could not remove the children from the jurisdiction of the court or the State of Louisiana. However, beginning in 2011, the judgment removed the geographic restriction and granted John additional summertime visitation for either the entire month of June or July at John’s election. After July 2011, the judgment granted John six weeks of summertime visitation at his election between June 1 and August 1. The trial court also reduced John’s child support obligation.
Amanda filed a motion for new trial, which was denied. John appealed from the trial court’s judgment, and Amanda answered the appeal. In Bonnecarrere v. 4Bonnecarrere, 09-1647 (La.App. 1st Cir.4/14/10), 37 So.3d 1038, writ denied, 10-1639 (La.8/11/10), 42 So.3d 381, this court reversed the portion of the trial court’s judgment modifying John’s physical custody, reversed the portion of the trial court’s judgment reducing John’s child support obligation, and remanded the matter to the trial court for a recalculation of John’s child support obligation.
Thereafter, on June 9, 2010, John filed a motion and order requesting that the court award him sole custody of the minor children, or alternatively, if the court finds that he is not entitled to sole custody, that he be granted joint custody and be designated as the domiciliary parent with whom the children will principally live and reside. As a final alternative, John requested that if the court did not award him sole or domiciliary custody, that the existing custody judgment be modified to provide for expanded custody of the father during the summer school holiday period and for a one week period during each of the three major school holiday periods, and to remove the restriction limiting his exercise of custody to the State of Louisiana. In his motion, John asserted that changes in circumstances had occurred since the original custody judgment, including: (1) his recent marriage to his long-term girlfriend; (2) Amanda’s marriage and pending divorce to her second husband, Chad Hickey; (3) alleged incidents of domestic violence between Amanda and Chad; (4) *1230 Amanda’s interference with John’s exercise of physical custody and limitation of John’s contact with his children by telephone; (5) Amanda’s continued attempts to sabotage the relationship between John and the minor children; (6) Amanda’s denial of contact between John’s parents and the minor children; and (7) Amanda’s demonstrated erratic and unstable behavior.
On August 2, 2010, the trial court held a hearing on John’s motion to modify custody. In a judgment signed on September 1, 2010, the trial court modified the prior custody award with respect to the minor children, awarding John custody of [Rthe minor children each year from September 1 until one week after the completion of the school year, and awarding Amanda custody of the minor children from one week after the completion of the school year until August 31 of each year and for the first seven days of the Christmas school holiday period. The trial court also ordered John to pay all transportation costs of the minor children and ordered the parties to facilitate communication between themselves and the minor children by webcam.[2] Amanda now appeals from a portion of this judgment.
DISCUSSION
The burden of proof on a party seeking to modify a prior permanent custody award is dependant on the nature of the underlying custody award. Custody awards are commonly made in two types of decisions. The first is through a stipulated judgment, such as when the parties consent to a custodial arrangement. The second is through a considered decree, wherein the trial court receives evidence of parental fitness to exercise care, custody, and control over a child. Shaffer v. Shaffer, 00-1251, p. 3 (La.App. 1st Cir.9/13/00), 808 So.2d 354, 356, writ denied, 00-2838 (La.11/13/00), 774 So.2d 151.
When an original custody decree is a stipulated judgment, a party seeking modification of custody must prove that a change materially affecting the welfare of the child has occurred since the original decree and that the proposed modification is in the best interest of the child. Richard v. Richard, 09-0299, pp. 7 (La.App. 1st Cir.6/12/09), 20 So.3d 1061, 1066. However, when the trial court has made a considered decree of permanent custody, the party seeking a change bears a heavy | ñburden of proving that the continuation of the present custody is “so deleterious to the child as to justify a modification of the custody decree,” or of proving by “clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child.” Bergeron v. Bergeron, 492 So.2d 1193, 1200 (La.1986).
On appeal, Amanda asserts that the trial court erred in finding that John met his burden of proof in seeking modifi *1231 cation of the judgment rendered on March 30, 2009. However, we note that the Mai’ch 30, 2009 judgment was reversed by this court in Bonnecarrere, 09-1647 at p. 9, 37 So.3d at 1045. Accordingly, the only judgment as to custody in effect at the time John filed his motion to modify custody was the September 12, 2008 stipulated judgment. Therefore, as the party seeking modification, John had to prove that a change materially affecting the welfare of the children had occurred since the original decree, and that the proposed modification is in the best interest of the children. See Richard, 09-0299 at p. 7, 20 So.3d at 1066.
However, in its reasons for judgment, the trial court stated:
For reasons this Court considers obvious from a transcript of the proceedings and from the testimony adduced, this Court is of the opinion that the current child custody arrangement is so “deleterious to the child as to justify a modification of the custody decree[.]” This Court believes that John Bonnecarrere has “by clear and convincing evidence” proven that “the harm likely to be caused by the change of environment is substantially outweighed by [its] advantages to the child[.]”
The trial court’s application of the heightened burden of proof under Bergeron to John’s motion to modify a stipulated judgment of custody is erroneous. However, we do not find that this error is prejudicial, because from our review of the record, 17John established that a change of circumstances materially affecting the welfare of the child had occurred since the original decree.[3]
Since the September 12, 2008 judgment, John has remarried and moved to Virginia, where he and his wife are employed with the military and live in a four-bedroom home in Stafford, Virginia. Also, Amanda began dating and eventually married Chad Hickey, whom she was in the process of divorcing at the time of the August 2, 2010 hearing. Amanda and Chad had an unstable relationship, with several domestic disturbances and verbal altercations, resulting in several separations and reconciliations. Further, Amanda admitted that Chad had “hit” her oldest child in an effort to discipline the child. Additionally, the record demonstrates that on multiple occasions, Amanda interfered with John’s scheduled exercise of physical custody and with his weekly telephone visitation with the minor children, despite her agreement to the pre-arranged visits.[4] Finally, Amanda often spoke ill of John in *1232 front of the minor children, such that one child repeated to her paternal grandmother that her mommy calls her daddy an “asshole.”
^Accordingly, from our review of the record in its entirety, we find substantial evidence to support the conclusion that John met his burden of proving that a change of circumstances materially affecting the welfare of the children had occurred since the original decree.
Having determined that John proved a change of circumstances, we now examine whether John established that a change in custody and move of his children to Virginia is in their best interest. The primary consideration in any child custody determination is the best interest of the child. La. C.C. art. 131. The court is to consider all relevant factors in determining the best interest of the child. La. C.C. art. 134. Every child custody case must be viewed in light of its own particular set of facts and circumstances. Elliott v. Elliott, 05-0181, p. 7 (La.App. 1st Cir.5/11/05), 916 So.2d 221, 226, writ denied, 05-1547 (La.7/12/05), 905 So.2d 293. As provided by La. C.C. art. 134, the factors considered may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
In(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
However, the factors listed in Article 134 are not exclusive. Harang v. Ponder, 09-2182, p. 11 (La.App. 1st Cir.3/26/10), 36 *1233 So.3d 954, 963, writ denied, 10-0926 (La.5/19/10), 36 So.3d 219.
Louisiana’s relocation statutes, which are based on the American Academy of Matrimonial Lawyers Model Relocation Act, also retain the best interest of the child standard as the fundamental principle governing decisions made pursuant to its provisions. Curole v. Curole, 02-1891, p. 4 (La.10/15/02), 828 So.2d 1094, 1096. These statutes, found in La. R.S. 9:355.1 through 9:355.17, govern relocation of a child’s legal or principal residence, regardless of the geographic location of the parties. See La. R.S. 9:355.1(4) and Bullock v. Bullock, 98-0206, p. 2 (La.App. 4th Cir.1/29/98), 706 So.2d 671, 672; see also Nelson v. Land, 01-1073, p. 4 (La.App. 1st Cir.11/9/01), 818 So.2d 91, 93 (following Bullock and emphasizing the clear and express language of the statute defining relocation). Louisiana Revised Statute 9:355.12(A) contains a list of factors to be used in reaching a decision regarding a proposed relocation:
(1) The nature, quality, extent of involvement, and duration of the child’s relationship with the parent proposing to relocate and with the nonrelocating parent, siblings, and other significant persons in the child’s life.
(2) The age, developmental stage, needs of the child, and the likely impact the relocation will have on the child’s physical, educational, and emotional development, taking into consideration any special needs of the child.
(3) The feasibility of preserving a good relationship between the nonrelocating parent and the child through suitable visitation | ^arrangements, considering the logistics and financial circumstances of the parties.
(4) The child’s preference, taking into consideration the age and maturity of the child.
(5) Whether there is an established pattern of conduct of the parent seeking the relocation, either to promote or thwart the relationship of the child and the nonrelocating party.
(6) Whether the relocation of the child will enhance the general quality of life for both the custodial parent seeking the relocation and the child, including but not limited to financial or emotional benefit or educational opportunity.
(7) The reasons of each parent for seeking or opposing the relocation.
(8) The current employment and economic circumstances of each parent and whether or not the proposed relocation is necessary to improve the circumstances of the parent seeking relocation of the child.
(9) The extent to which the objecting parent has fulfilled his or her financial obligations to the parent seeking relocation, including child support, spousal support, and community property obligations.
(10) The feasibility of a relocation by the objecting parent.
(11) Any history of substance abuse or violence by either parent, including a consideration of the severity of such conduct and the failure or success of any attempts at rehabilitation.
(12) Any other factors affecting the best interest of the child.
This list parallels the listing of multiple factors found in La. C.C. art. 134, with special emphasis on the logistical and economic circumstances associated with a relocation, particularly an out-of-state relocation. Gray v. Gray, 45,826, p. 8 (La.App. 2nd Cir.11/17/10), 55 So.3d 826, 834 (on rehearing).
*1234 John, who is now a resident of Virginia, seeks a modification of custody, requesting sole custody or designation as the domiciliary parent, the practical effect of which would be the relocation of the children’s principal residence to Virginia. Therefore, under the facts and circumstances of this case, the factors articulated in La. R.S. 9:355.12 are particularly relevant in determining the best interest of the child, and the trial court legally erred in failing to consider those factors, in addition | „to the Article 134 factors, in determining the best interest of the child. Cf. Gathen v. Gathen, 10-2312 (La.5/10/11), 66 So.3d 1. Accordingly, with these principles in mind, we review this matter de novo to determine whether John has established that the proposed modification of custody is in the best interest of the two minor children.
Our review of the record demonstrates that the children, who were five and three at the time of the custody hearing, have lived their whole lives in Louisiana with Amanda. Since 2008, the minor children have resided with Amanda in her childhood home, have lived next door to their maternal grandmother, and have lived close to their paternal grandparents. The children see their maternal grandmother on a daily basis and occasionally visit with their paternal grandparents. Additionally, the children visit every summer with Amanda’s sister in Mississippi. Because Amanda only works part time, managing a mini-storage facility and cleaning an elderly man’s home once a week, she is able to be home more with the children. Additionally, Amanda stated that she does various arts and crafts projects with the children and has memberships to the Audubon Zoo and Aquarium of the Americas, where she frequently takes the children. She also takes them to dance and soccer, which, according to Amanda, John does not approve. They also attend church and Sunday school at the Methodist church.
John, however, was deployed with the military in Iraq, particularly after the youngest child’s birth. After John returned to Louisiana, he moved to Minnesota, admittedly partly to get away from Amanda, and now lives in Virginia, where he works for the military. According to the previous judgment, he had limited periods of physical custody of the children, which were confined to Louisiana. However, John stated that if he had three or four days of vacation, he tried to go to Louisiana to see the children, which was approximately every three months.
[^Because of the young ages of the children, they are clearly too young for their preferences to be considered. Additionally, the evidence indicates that the younger child has been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and Oppositional Defiant Disorder (ODD), which require daily medication. The child’s treating physician has also recommended treatment with a psychiatrist. Though no expert was called upon to render an opinion as to the effect any potential move may have on the child, the record does demonstrate that the child is extremely close to Amanda, so much so that she does not let Amanda out of her sight. Also, the child is not as excited as the older child about her visits with John. However, John indicates that he did not observe any issues with the child’s behavior and generally disputes the diagnoses of the treating physicians and their prescribed treatment. Further, though there is no indication in the record that the child has been adversely affected by John’s exercise of physical custody, we note that all physical custody was limited to Louisiana and did not involve the child being relocated out of state.
*1235 With regard to preserving or promoting a good relationship between the other parent and the child, John testified that if he was awarded sole custody or domiciliary custody of the children, he would do anything within reason to foster Amanda’s visitation with the children. Though the history of the parties reveals that they have been unwilling to cooperate with one another and have exhibited demeaning and controlling behavior toward each other, there is no evidence in the record that John has exhibited any such behavior in front of the children, or that he has expressed any negative opinions of Amanda in front of the children. Additionally, the record demonstrates that John and his current wife, Annie, have facilitated the children’s contact with Amanda while in John’s custody by allowing 11sthe children to call Amanda and by assisting the older child in sending emails to Amanda.
Conversely, the record is replete with evidence of Amanda’s repeated efforts to thwart the children’s relationship with John. Amanda not only spoke ill of John in front of the children, but she also referred to Chad as the children’s “daddy,” and encouraged the children to call him “daddy.” Additionally, Amanda denied John frequent telephone visitation, allowing him to talk to the children only once a week, and often did not adhere to the prearranged schedule. There were several occasions, particularly during the week of the children’s dance recital and on the older child’s birthday, when John was not able to speak to his children at all. Amanda also denied John physical custody of the children on several occasions when she unilaterally altered the time for John’s exercise of physical custody after previously agreeing to the scheduled time. Particularly, in January 2010, Amanda took the children to Baton Rouge on the day John’s scheduled physical custody was to commence, and upon their return home, John was waiting in her driveway with Detective Bill Athman of the Tangipahoa Parish Sheriffs Office to enforce the custody agreement. Despite the officer’s presence and the fact that the children were excited to see their father, Amanda would not allow the children to go with John until the next day. Detective Athman testified at the hearing that Amanda did not give him any reason why she was not allowing the children to leave with John. Amanda also would not allow the children to go with John on a subsequent occasion when the children allegedly were recovering from flu-like symptoms. Amanda asserted that she delayed the physical custody because John was going to take the children camping in below-freezing weather. However, John stated that he offered to take the children to his parents’ home instead, and Amanda still denied his exercise of physical custody.
114With regard to John’s employment and economic circumstances and the enhancement of John and the children’s quality of life, the evidence establishes that John and his current wife work for the military earning approximately $100,000 each. John admitted that their current positions are temporary, but that they have numerous job opportunities in the Washington D.C. area that would provide commensurate income, as opposed to the lower income jobs available to them in Louisiana. Further, though John acknowledged that his employment with the military once required him to travel extensively out of the country, he stated that he is no longer deployable, so he would no longer have to leave the country for extended periods of time. However, because John and his current wife both work full time, the youngest child would be in day *1236 care, rather than attending preschool as she was scheduled to do in Louisiana.
In addition to John’s employment circumstances, the evidence establishes that John and his current wife enjoy a loving relationship, live in a large home in a good neighborhood and school district, and are close to Washington D.C., which provides unique cultural and educational opportunities for the children.
Amanda, however, only works part time, and relies on her part-time income, child support payments from John, and assistance from her mother to support her and the children’s financial needs. Though the evidence indicates that Amanda lives in a large home owned and formerly occupied by her parents, as of the date of the hearing, she was having substantial difficulty paying her bills and had a negative checking account balance. Additionally, she had been unable to complete her college education and was having difficulty obtaining full-time employment.[5]
Further, we find that the record demonstrates a pattern of marital discord in Amanda’s home. Not only did Amanda and her husband, Chad, yell at one another 11fiin front of the children, but the older child told John that Amanda was allowed to hit Chad because “he deserved it.” Additionally, Amanda admitted that she and Chad “got into it” because she did not approve when Chad “hit” the oldest child in an effort to discipline the child. Further, there were at least two other incidents of domestic violence. In December 2009, Chad returned home in the middle of the night from a Christmas party with a friend, and Chad and Amanda got into a verbal and physical altercation, resulting in Amanda throwing Chad out of the house. The two subsequently reconciled, but in January 2010, they separated again. While in the process of moving his things out of Amanda’s house, Amanda and Chad got into another verbal and physical altercation, whereupon Chad sprayed Amanda with pepper spray and an ambulance was called to the home. Amanda subsequently had charges filed against Chad as a result of this incident, but the charges were dropped after the two reconciled for a second time. Though the children were asleep during the first incident, they were present for the arguing during the second incident and witnessed their mother being treated by the paramedics after she had been sprayed with the pepper spray. At the time of the hearing, Amanda stated that she and Chad were getting divorced, and that he is no longer in the home. However, Amanda admitted that she is still close to Chad’s son.
Finally, in considering other factors affecting the best interest of the children,[6] we note that Amanda suffers from depression, for which she takes Zoloft and Xa-nax “as needed.” Additionally, Amanda admitted that she married Chad to offer stability for her children. However, the evidence establishes that the two had a tumultuous relationship, that she dated other men while temporarily separated from Chad, and that she was also listed on several online dating websites. Further, 11flthough Amanda did obtain prompt *1237 medical care for the minor children, we note that she was not always as prompt or thorough in communicating the children’s medical conditions and care to John. Amanda also gave misleading information regarding John’s family medical history to the younger child’s neurologist, which ultimately contributed to the child’s diagnoses of ADHD and ODD, for which the child was prescribed strong, controlled medication. Amanda subsequently altered the doses of the medication, giving John verbal instructions to reduce the dosage. However, Amanda did not provide John with the prescription bottle or any instructions from the child’s physician, but rather, gave John the medication in an unlabeled bottle. Finally, despite the recommendation of the child’s treating neurologist that the child see a psychiatrist, Amanda did not take the child, even though John had agreed to pay for the psychiatric care.
With regard to John, the record demonstrates that he recently had a melanoma reftioved, but that there are no continuing complications, and he is otherwise in good health. The record does demonstrate, however, that John has exhibited a pattern of harassing and temperamental behavior. John harassed the youngest child’s neurologist, questioning her treatment and care of the child and threatening to sue her, to the point that the neurologist withdrew as the child’s physician. Additionally, Amanda filed a rule seeking to enjoin John from sending her harassing text messages and emails and from making harassing telephone calls to her and her family members. According to the rule, not only had John sent her threatening text messages and emails, but he also had called the sheriffs office to conduct a “safety check” of his children when Amanda did not answer the telephone when he called. At the previous hearing of this matter in July 2008, the trial court noted that John was “wound tight,” and in denying Amanda’s claim for harassment and abuse, the court cautioned John to conduct himself in a manner worthy of the uniform he wore |17and in a manner that he would not object to having his children observe. The court further cautioned John that it would not be so lenient in the future.
After reviewing the entire record in this matter, we find that maintaining joint custody of the children, but with John having custody from September 1 each year until one week after the completion of the school year and Amanda having custody of the children from one week after the completion of the school year until August 31 of each year and for the first seven days of the Christmas holiday period, is in the best interest of the children. Amanda has repeatedly demonstrated that she does not value and is unwilling to facilitate the children’s relationship with John. Further, though Amanda does go through periods where she is accommodating to John and his family, these periods are few in comparison to the amount of time that these parties have been sharing joint custody. Additionally, because of poor choices Amanda has made in her personal life, she has been unable to provide a stable home environment for her children and has exposed them to violence, unrest, and economic hardship.
John, however, has married his long-term girlfriend, with whom he has a loving relationship. John and his wife have established a home in Virginia and have substantially increased their income. Further, though John has exhibited some problems with his behavior in the past, his testimony from the most recent hearing demonstrates a more mature, calmer dis *1238 position. Therefore, considering John’s current circumstances, he can offer stability to the children, which they desperately need, particularly considering the medical conditions suffered by the younger child.
In reaching this decision, we are cognizant that the children will have to leave them primaiy caretaker and their home in Louisiana for the majority of the year and move to an unfamiliar place. However, given the totality of the circumstances, we find that awarding primary custody to John is the children’s best interest at this time.
118Finally, Amanda asserts on appeal that her communications with Chad during their marriage were subject to spousal privilege, and therefore, the trial court erred in admitting Chad’s testimony at the custody hearing. Louisiana Code of Evidence article 504 provides:
A. Definition. A communication is “confidential” if it is made privately and is not intended for further disclosure unless such disclosure is itself privileged.
B. Confidential communications privilege. Each spouse has a privilege during and after the marriage to refuse to disclose, and to prevent the other spouse from disclosing, confidential communications with the other spouse while they were husband and wife.
C. Confidential communications; exceptions. This privilege does not apply:
(1) In a criminal case in which one spouse is charged with a crime against the person or property of the other spouse or of a child of either.
(2) In a civil case brought by or on behalf of one spouse against the other spouse.
(3) In commitment or interdiction proceedings as to either spouse.
(4) When the communication is offered to protect or vindicate the rights of a minor child of either spouse.
(5) In cases otherwise provided by legislation.
The majority of Chad’s testimony dealt with his observations as a member of Amanda’s household and therefore fall outside of Article 504. See State v. Nash, 36,038, p. 9 (La.App. 2nd Cir.6/14/02), 821 So.2d 678, 684, writ denied, 02-2527 (La.6/27/03), 847 So.2d 1254. Further, the evidence indicates that the children were present or within earshot of most of the communications between Amanda and Chad, and therefore, those communications are not confidential and not subject to the spousal privilege. Finally, with regard to the two incidents of domestic abuse occurring in December 2009 and January 2010, we note that to the extent Chad’s testimony as to these events was offered to protect the rights of the minor children, who were in the home or witnessed portions of these events, they are excepted from | iabeing a confidential communication. See La. C.E. art. 504(C)(4). Accordingly, the trial court was correct to allow Chad’s testimony.
CONCLUSION
For the foregoing reasons, we affirm the judgment of the trial court, awarding John custody of the minor children each year from September 1 until one week after the completion of the school year, awarding Amanda custody of the minor children from one week after the completion of the school year until August 31 of each year and for the first seven days of the Christmas school holiday period, ordering John to pay all transportation costs of the minor *1239 children, and ordering that the parties facilitate communication between themselves and the minor children by webcam. All costs of this appeal are to be assessed to Amanda Bonnecarrere.
AFFIRMED.
PARRO, J., concurs.
HUGHES, J., dissents with reasons.

. At the time of the hearing in this matter, Amanda had remarried and her new last name was Hickey.

. The trial court also addressed the recalculation of John’s child support obligation pursuant to this court’s remand in Bonnecatrere, 09-1647 at pp. 10-15, 37 So.3d at 1046-1049 and ordered that the amount of $390 per month, less the federal credit for dependent care expenses provided by Internal Revenue Form #2441, be added to the child support obligation of John for the period of time from October 17, 2008, to May 31, 2009, and that the private school tuition for the older child, in the sum of $242 per month, be added to the child support obligation of John for the period of time from October 17, 2008, until the date of the judgment. However, neither party appeals this portion of the trial court’s judgment.

. Amanda asserts that the trial court erred in failing to apply La. R.S. 9:346 to John’s allegation that Amanda interfered with his exercise of physical custody and telephone visitation. Louisiana Revised Statute 9:346 provides, in pertinent part:
A. An action for the failure to exercise or to allow child visitation, custody or time rights pursuant to the terms of a court-ordered schedule may be instituted against a parent. The action shall be in the form of a rule to show cause why such parent should not be held in contempt for the failure and why the court should not further render judgment as provided in this Section.
[[Image here]]
H. A pattern of willful and intentional violation of this Section, without good cause, *1232 may be grounds for a modification of a custody or visitation decree.
[[Image here]]
J. The action authorized by this Section shall be in addition to any other action authorized by law.
Without addressing whether there was a court-ordered custody and visitation schedule in the instant matter, we find that Subsection J clearly provides that any action under La. R.S. 9:346 is in addition to any other action authorized by law. Accordingly, while John had the option to file an action for contempt in addition to his motion to modify custody, he was not required to file a contempt action. Accordingly, Amanda’s assignment of error is without merit.

. Considering Amanda’s financial condition, her relocation to Virginia is clearly not feasible.

. The extent to which the objecting parent has fulfilled his or her financial obligations to the parent seeking relocation is not relevant to the instant case since John, and not Amanda, was responsible for the payment of child support.