HUGHES, J.
12This is an appeal from a judgment of the Thirty-Second Judicial District Court. The judgment awarded the parties, Elizabeth Donald Kingrey Romero (Elizabeth) and Douglas Anthony Trahan (Doug), joint custody of their minor child. The judgment further designated Elizabeth as the domiciliary parent and allowed Elizabeth to relocate the minor child to West Virgi *349 nia. Doug has appealed. For the following reasons, we reverse and render.
FACTS AND PROCEDURAL HISTORY
Elizabeth and Doug had a somewhat tumultuous relationship that lasted approximately a year and a half. They never married. Close to the end of the relationship, Elizabeth became pregnant with their son, Devon Bryce Trahan. The two were no longer together when Devon was born on January 3, 2005 in Lafayette, Louisiana, where Elizabeth lived throughout her pregnancy and at the time of Devon’s birth. While there was initially some question as to the issue of paternity due to Elizabeth’s admission that at least five other men could have fathered Devon, it was determined through DNA testing shortly after Devon’s birth that Doug was the father. At that time, Doug fully accepted the obligations and responsibilities of parenthood. Around the time that Devon was five weeks old, on March 3, 2005, Doug and Elizabeth entered into a consent judgment wherein they shared equal joint custody of Devon on a one-week rotating basis, with Elizabeth designated as the domiciliary parent.
Elizabeth married her current husband, Timothy Romero (Tim), on July 21, 2005. In 2009 Tim was transferred to West Virginia and the Romeros moved there with Devon. Elizabeth did not file a Notice of Relocation, as required by LSA-R.S. 9:355, et seq. Instead, the record |3reflects that Elizabeth filed a “Rule for Custody” on July 15, 2009, wherein she stated that her husband’s employer, The Wood Group, was shutting down its facilities in Louisiana and that Tim “has been offered a promotion to stay with the company, but a transfer and move to Fairmont, Virginia, [sic] is required to keep that employment.” Elizabeth alleged that due to the move to West Virginia, the shared custody arrangement in effect for Devon should be changed. In response, Doug filed a “Rule for Change of Custody” wherein he opposed Elizabeth’s request to relocate Devon out-of-state and alleged that it was in Devon’s best interest that he be designated domiciliary custodial parent. Specifically, Doug alleged that Elizabeth had informed him that she intended to relocate with Devon to West Virginia, that she had attempted to alienate and estrange Devon from him, had shown an inability to facilitate and encourage a close and continuing relationship between him and Devon, had failed to properly care for Devon, and had endangered Devon. In a subsequent pleading, Doug alleged that Elizabeth failed to follow the statutory requirements of LSA-R.S. 9:355, et seq. by failing to give him notice of the proposed relocation and failed to provide the address, telephone number, date of move, proposed revised schedule of visitation, and a statement informing him that an objection of the proposed relocation should be filed within thirty days of the receipt of the notice (which he did not get.)
Thereafter, the parties entered into an interim consent judgment on September 4, 2009, wherein they agreed, pending litigation, to temporarily share custody of Devon on a twenty-eight day rotating basis, and that the parent who did not have the child be allowed to call the child once every other day between 4:00 p.m. and 5:00 p.m.
|4A hearing was held on July 14, July 16, August 6, and September 9, 2010. At the conclusion of the hearing, the trial court rendered judgment, granting the parties joint custody of Devon with Elizabeth designated as the domiciliary parent, subject to visitation in favor of Doug, pursuant to a Joint Custody Plan confected by the trial court. The judgment also held that Devon *350 would reside with Elizabeth in West Virginia. In written reasons for judgment, the court stated that, because all prior judgments issued in conjunction with this matter were by consent of the parties, and that there had never been a “considered decree” rendered in the case, “[e]ach party need only prove a change in circumstances materially affecting the welfare of Devon and that any proposed changes to the previous child custody decree are in the best interest of Devon.” The court stated further that “[t]he court has reviewed Louisiana Civil Code article 134 which sets forth factors the Louisiana Legislature deems important in determining the best interest of a child for custody purposes. Based on the court’s consideration of those factors the court finds that it is in Devon’s best interest that the parties have joint custody of Devon and that Ms. Kingrey [Elizabeth] remain as the domiciliary parent with a requirement that Devon reside with her in West Virginia.”
Doug filed a motion for new trial, which was denied by the trial court, and this appeal followed. In his appeal, Doug makes the following assignments of error:
1. The trial court erred in designating the mother, Elizabeth Donald Kingrey, the domiciliary custodial parent, subject to visitation in favor of the father, Doug Anthony Trahan.
2. The trial court erred in allowing the mother, Elizabeth Donald Kingrey, to relocate the minor child to West Virginia.
3. The trial court erred in failing to consider the factors as provided in Louisiana Revised Statute LSA R.S. 9:355 et seq.
|b4. The trial court erred in failing to require the mother, Elizabeth Donald Kingrey, to provide for the transportation and/or the cost of the transportation of the minor child from the State of West Virginia to the State of Louisiana and back to the State of West Virginia.
5. The trial court erred in determining that the mother, Elizabeth Donald Kin-grey’s schedule allowed her to be available for Devon Bryce Trahan essentially all of the time.
6. The trial court erred in determining that the father, Doug Anthony Trahan’s schedule does not allow him to be available for Devon Bryce Trahan essentially all of the time.
7. The trial court erred in determining that the father, Doug Anthony Trahan, should only be allowed 35 days of summer visitation when the child is out of school.
8. The trial court erred in determining that the father, Doug Anthony Trahan, should lose days of visitation with the minor child while traveling to and from West Virginia and Louisiana.
9. The trial court erred in determining that the father, Doug Anthony Trahan, should not have more holiday visitation as a result of the relocation of the minor child to the State of West Virginia.
LAW AND ANALYSIS
I. Standard of Review
Doug’s second and third assignments of error allege legal error on the part of the trial court, specifically that the trial court erred in failing to consider the enumerated factors set forth in LSA-R.S. 9:355, et seq., relating to the determination of a child’s best interest in relocation cases. The written reasons for judgment of the trial court clearly demonstrate, and we must conclude, that the trial court failed to consider the relocation statutes and instead relied solely on the “best interest” factors for awarding custody set forth in LSA-C.C. art. 134. Even though Elizabeth’s rule may only request a modification of custo *351 dy, the practical effect of a judgment in her favor is the relocation of Devon to West Virginia. In his pleadings, Doug opposed the relocation. Therefore, under the facts and circumstances of this | ficase, the trial court was required to consider the factors listed in LSA-R.S. 9:355, et seq., which specifically relate to the determination of a child’s best interest in relocation cases, in addition to the factors set forth in Article 134.
A court of appeal may not set aside a trial court’s or jury’s finding of fact in the absence of manifest error or unless it is clearly wrong. Where one or more trial court legal errors interdict the fact-finding process, the appellate court should then make its own independent de novo review of the record. Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731, 735, citing Lasha v. Olin Corp., 625 So.2d 1002, 1006 (La.1993).
A legal error occurs when a trial court applies the incorrect principles of law and such errors are prejudicial. Evans v. Lungrin, 708 So.2d at 735. Prejudicial legal errors occur “when they materially affect the outcome and deprive a party of substantial rights.” Evans v. Lungrin, 708 So.2d at 735. ‘When such a prejudicial error of law skews the trial court’s finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo.” Evans v. Lungrin, 708 So.2d at 735.
In this case, the trial court failed to conduct any analysis of the mandatory factors enumerated in the relocation statute, which was clearly prejudicial. Accordingly, we review this matter de novo, based on the evidence in the record.
II. Custody of Devon
The burden of proof required of a party seeking to modify an existing custody award is dependent on the nature of the underlying custody determination. If the original custody decree is a “considered decree,” the party seeking its modification bears the heavy burden of proving that the ^continuation of the present custody is so “deleterious to the child as to justify a modification of the custody decree,” or of proving by “clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child.” Bergeron v. Bergeron, 492 So.2d 1193,1200 (La.1986).
However, the prior custody arrangement at issue herein was in a stipulated judgment by consent of the parties. As such, the parties in this case must only prove that a change materially affecting the welfare of the child has occurred since the original decree and that the proposed modification is in the best interest of the child. Richard v. Richard, 09-0299 (La.App. 1 Cir. 6/12/09), 20 So.3d 1061, 1066.
At the time that the parties entered into the “seven and seven” custody arrangement, Devon was an infant. Under that agreement, Devon spent one week in Lafayette with his mother and step-father, and the next week in Houma with his father and paternal grandparents. However, he has now reached school age and has entered kindergarten. His mother and step-father have also moved to West Virginia. During the pendency of the hearing of this matter, Devon was in pre-kinder-garten and the parties continued to share equal time with Devon, resulting in Devon traveling between Louisiana and West Virginia on a monthly basis. The trial court determined that because of Devon’s age and the fact that his mother had moved to West Virginia, “[i]t goes without saying *352 that these are changes in circumstances materially affecting the welfare of the child and that the court must now confect a custody decree in Devon’s best interest.”
The primary consideration in any child custody determination is the best interest of the child. LSA-C.C. art. 131. The court shall consider all relevant factors in determining the best interest of the child. LSA-C.C. art. |s134. Every child custody case must be viewed in light of its own particular set of facts and circumstances, however, we note that the factors listed in Article 134 are not exclusive. Bonnecarrere v. Bonnecarrere, 11-0061 (La.App. 1 Cir. 7/1/11), 69 So.3d 1225, 1232; Elliott v. Elliott, 05-0181 (La.App. 1 Cir. 5/11/05), 916 So.2d 221, 226, writ denied, 05-1547 (La.7/12/05), 905 So.2d 293.
In this case, Elizabeth, who is now a resident of West Virginia, seeks a modification of custody, requesting sole custody and designation of domiciliary status, with visitation in favor of Doug. Doug objects to the relocation of his son and also seeks sole custody and designation of domiciliary status, with visitation in favor of Elizabeth. As discussed above, the practical effect of Elizabeth’s request is the relocation of Devon to West Virginia. Therefore, the trial court should have considered not only the “best interest” factors of LSA-C.C. art. 134, but was also required to consider the factors enumerated in LSA-R.S. 9:355, et seq. And while the factors themselves somewhat overlap, the relocation statute’s application is particularly important for the purpose of determining the proper burden of proof. See Gray v. Gray, 11-548 (La.7/1/11), 65 So.3d 1247, 1255; see also Johnson v. Spurlock, 07-949 (La.App. 5 Cir. 5/27/08), 986 So.2d 724, writ denied, 08-1400 (La.7/25/08), 986 So.2d 670.
II. Relocation of Devon
Louisiana Revised Statutes 9:355, et seq. sets forth the burden of proof and factors to be considered when determining whether a child is allowed to be relocated. Under those provisions, “[t]he relocating parent has the burden of proof that the proposed relocation is made in good faith and is in the best interest of the child.” LSA-R.S. 9:355.13. “In determining the child’s best interest, the court shall consider the benefits which the child will [ 9derive either directly or indirectly from an enhancement in the relocating parent’s general quality of life.” Id.
Therefore, as the relocating parent, the burden of proof lies with Elizabeth. She must both show that the relocation was in good faith, and that the relocation is in Devon’s best interest.
III. Analysis of the Relevant Laws
A. Good Faith
We may conclude that Elizabeth’s relocation was initially made in good faith. Her primary reason for moving was that her husband’s employer shut down its Louisiana facility and offered him a promotion and an opportunity to remain with the company, but required him to transfer to West Virginia. She therefore desired to move with her husband. We find, therefore, that the move was initially made in good faith.
However, the testimony provided at trial reveals that while Tim originally moved to West Virginia in order to maintain employment with The Wood Group, the company for which he was employed for the previous nine years; as of the time of the trial, he no longer worked for The Wood Group. He resigned that position in March of 2010, prior to the hearing, and accepted a position with a competitor of The Wood Group, Seaboard International, also located in West Virginia. There is no evidence in the record as to whether Tim attempt *353 ed, once he made the decision to resign from The Wood Group, to find comparable employment in Louisiana before accepting another position in West Virginia. Therefore, while we find that the request to relocate was initially made in good faith, the question is raised as to whether that good faith continued after Tim’s resignation, and, without any evidence of an attempt to return to Louisiana, accepted yet another position more than 1,000 miles away.
|inB. Mandatory Factors
Under LSA-R.S. 9:355.12, in reaching its decision regarding whether to allow a proposed relocation of a child, the court shall consider the following factors:
(1) The nature, quality, extent of involvement, and duration of the child’s relationship with the parent proposing to relocate and with the nonrelocating parent, siblings, and other significant persons in the child’s life.
(2) The age, developmental stage, needs of the child, and the likely impact the relocation will have on the child’s physical, educational, and emotional development, taking into consideration any special needs of the child.
(3) The feasibility of preserving a good relationship between the nonrelocating parent and the child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties.
(4) The child’s preference, taking into consideration the age and maturity of the child.
(5) Whether there is an established pattern of conduct of the parent seeking the relocation, either to promote or thwart the relationship of the child and the nonrelocating party.
(6) Whether the relocation of the child will enhance the general quality of life for both the custodial parent seeking the relocation and the child, including but not limited to financial or emotional benefit or educational opportunity.
(7) The reasons of each parent for seeking or opposing the relocation.
(8) The current employment and economic circumstances of each parent and whether or not the proposed relocation is necessary to improve the circumstances of the parent seeking relocation of the child.
(9) The extent to which the objecting parent has fulfilled his or her financial obligations to the parent seeking relocation, including child support, spousal support, and community property obligations.
(10) The feasibility of a relocation by the objecting parent.
(11) Any history of substance abuse or violence by either parent, including a consideration of the severity of such conduct and the failure or success of any attempts at rehabilitation.
| n(12) Any other factors affecting the best interest of the child.
B. The court may not consider whether or not the person seeking relocation of the child will relocate without the child if relocation is denied or whether or not the person opposing relocation will also relocate if relocation is allowed.
We specifically note that while LSA-C.C. art. 134 lists factors that a court may consider when determining a child’s best interest in regards to custody (“some factors the court can consider when determining custody of a child may include”), LSA-R.S. 9:355.12 lists factors that a court must consider regarding whether to allow a proposed relocation (“In reaching its decision regarding a proposed relocation, the court shall consider the following factors.”) As such, pursuant to our de novo review, *354 we will address the mandatory factors first.

Factor 1 (The nature, quality, extent of involvement, and duration of the child’s relationship with the parent proposing to relocate and with the nonrelocating parent, siblings, and other significant persons in the child’s life)

Doug and Elizabeth have enjoyed joint custody of Devon since shortly after his birth. It is undisputed that they have each had equal physical time with Devon. Prior to Elizabeth’s move, the parties set custody on a seven-day rotating schedule and, after the move, on a twenty-eight day rotating schedule. Both parties agree that the child loves and cares for the other. Elizabeth does not dispute that Doug has been an active, loving father.
Elizabeth testified that she loves her son and that she breastfed him until he was three weeks old, at which time she quit in order to be able to leave Devon with another caretaker to return to work. She stated that when Devon is with her, she prepares his breakfast, dresses him, and grooms him. Either she or Tim drives Devon to school and picks him up from after-care each day. While Devon attends school and then goes to an after-care facility 1 igfor approximately one hour each day, it is unclear from the record how Devon is transported from school to that facility. Once home, Elizabeth stated that either she or Tim helps Devon with his homework, prepares supper, and puts him to bed. On the weekends, the family goes camping, fishing, or swimming.
Tim testified that he was present at the hospital when Devon was born and has been there for Devon since that time. He enjoys taking Devon to the park, swimming, and golfing. Tim described the after-care facility Devon attends in West Virginia as a “learning center” and stated that he goes there for approximately one hour after school each day. Tim stated that his job is flexible and affords him the ability to bring Devon to school, pick him up from after-care, or leave to check him out early in the event he becomes ill. Tim testified that Devon is “close” to his mother and that Devon is also affectionate towards him, but that after he first returns from his father’s, he is “rude,” calls him names, and “has a complex” towards him about his weight. He attributes this to be a result of Doug’s influence on Devon.
Doug testified that he works nights from 7 p.m. to 7 a.m. for one-week intervals. During his work-week, he leaves his home at 6 p.m. and returns in the morning at 8 a.m. Once home, he prepares Devon’s breakfast and lunch, dresses him, and drives him to school each morning. He also returns to the school to drive Devon home. He testified that during the weeks he is working, he is only unavailable for approximately one hour in the morning and two hours in the evening before Devon’s bedtime,[1] that Devon is sleeping for the remainder of the time that he is at work, and that his parents willingly help him during those times. Doug is available all of | iSthe time during the weeks that he is not working. Doug stated that he is active in Devon’s school, he has given lectures to Devon’s class, attended the Halloween Bazaar, the Parent’s Day Lunch, and his pre-kindergarten celebration. He cooks funnel cakes for Devon’s school, helps Devon with his schoolwork, is a member of the Parent-Teacher Club, and is also a school volunteer. For extra-curri *355 cular activities, he says that Devon enjoys playing t-ball, and he is the assistant coach of Devon’s t-ball team. He takes Devon camping on the beach, to Grand Isle, Yogi Bear Park, and to the Global Wildlife Center in Robert, Louisiana. He and Devon go to Blue Bayou Water Park, and enjoy bicycling, boating, fishing, four-wheeler riding, horseback riding, and dune-buggy riding.
Doug’s father, Gilbert Trahan, testified that he is 76 years old and his wife of 54 years, Betty Trahan, is 70. Doug is the youngest of their five children, and Devon is one of fourteen grandchildren. He testified that he and his wife are in good health and have no disabilities. They are retired and are available at their residence at all times. Mr. Gilbert testified that Doug cares for Devon, has an “excellent” relationship with Devon, and is committed “110%” to raising Devon. He and his wife are happy to help their son if needed because they are loving grandparents. Devon appears extremely close to his paternal grandparents, with whom he and his father live. They have been a presence in Devon’s life since his birth, and help Doug take care of Devon when Doug is working. They live in Houma, Louisiana.
While with his father, Devon attends Mulberry Elementary School in Houma and was “Student of the Month” in December. His teacher there, Ms. Julie Ze-ringue, testified that Doug fully participated in Devon’s school activities, and even sometimes went to the school to spend lunchtime and 114recess with Devon and his friends. She confirmed that Doug brought Devon to school and picked him up each day, and that Devon had nearly perfect attendance.
Devon has two half-brothers, Jade and Noah, who reside in Lebanon, Missouri, with their father, Danny Kingrey. Jade and Noah visit Elizabeth, their mother, during holidays or during the summer. Devon also has a step-brother and stepsister that live in Lafayette, Louisiana with their mother, who is divorced from Tim.
Devon has never met his mother’s adoptive parents, Bill and Helen Donald, due to Elizabeth’s allegations of sexual molestation against Ms. Donald. They live in Lebanon, Missouri, close to Danny Kin-grey and his two sons with Elizabeth, Jade and Noah (Devon’s half-brothers.) However, Tim testified that Elizabeth now has “brand new adoptive parents” who are Korean and that he, his wife, and Devon all love them very much. They also live in Lafayette, and when in Louisiana, Elizabeth and Tim stay with them at their home.
Devon has approximately ninety other relatives, including Doug’s brothers and sisters (Devon’s aunts and uncles), and Devon’s cousins, living in or around the Houma area. Tim and Elizabeth admitted that they have no other family in West Virginia.
Considering the distance between Louisiana and West Virginia, we find that the quality of the relationship between Devon and his father and other significant persons in Devon’s life, specifically, his grandparents, would be inhibited by the move. The move will strain the close, long-term, stable relationship Devon has with his father, who, because of the great distance, can no longer participate as he once did in Devon’s life. It would also undoubtedly strain Devon’s relationship with his grandparents and 1 ]Suncles, aunts, and cousins as they would much less likely have opportunities to see Devon. Essentially, Devon’s ability to see his grandparents and other significant family members would be limited to once every six months, when Devon is accustomed to spending time with them every other week. Additionally, both Tim and Elizabeth have children or other fami *356 ly members living in the Lafayette area. This provides them more opportunities to visit Devon throughout the year in Louisiana than Doug would have to visit Devon in West Virginia.
Considering the above facts as a whole, we conclude that the evidence as to Factor 1 weighs against allowing the relocation. Factor 2 (The age, developmental stage, needs of the child, and the likely impact the relocation will have on the child’s physical, educational, and emotional development, taking into consideration any special needs of the child)
Devon is five years old and the parties both agree that he is a well-adjusted, intelligent child. No evidence was introduced that would indicate a negative physical impact on Devon by the move, per se. However, there is testimony in the record and allegations by Doug that Elizabeth is not properly handling Devon’s severe allergy to eggs and shellfish by failing to provide Devon’s school or daycare with an Epi-Pen,[2] as ordered by Devon’s physician. The EpiPen must be administered to Devon immediately to reverse the effects of anaphylactic shock that could be caused if Devon were to be exposed to foods containing eggs or shellfish, or processed in plants that also process foods containing eggs or shellfish. When questioned about this, Elizabeth testified that the teacher at the daycare Devon attended advised her that she was not comfortable administering the drug. Elizabeth determined that because she worked only “three” minutes away, it would 11fisuffice for her to keep the Epipen and instruct the daycare to phone her in the case of an emergency. While this is questionable, and clearly not the instructions of Devon’s physician, the testimony revealed that the new school Devon attends in West Virginia does have an Epipen on site and thus, this concern has been alleviated. There was no testimony that Devon requires the care of a specialized physician such that comparable care would not be available in West Virginia.
Additionally, as discussed further here-inbelow, in regards to the educational opportunities in each state, there was no evidence as to whether West Virginia or Louisiana provided any benefit over the other. We find that this factor does not weigh heavily in favor of either party. Factor 3 (The feasibility of preserving a good relationship between the nonrelocat-ing parent and the child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties)
Under the joint custody plan confected by the trial court at the conclusion of these proceedings, Doug was awarded the following visitation:
1. 30 consecutive hours per month, excluding June, July, August, November, December, and the month of Easter;
2. Thanksgiving and Easter to commence 12 hours after school lets out and to end at least 12 hours before school resumes;
8. Half of the Christmas and/or New Years holidays such that Christmas Day is alternated between Doug and Elizabeth each year;
4. 35 consecutive days of the summer holidays, excluding the 5 days after school ends and the 5 days prior to the date school begins;
5. In-state visitation to be on Saturday and Sunday, provided that Devon is *357 returned to Elizabeth at least 12 hours before school resumes, excluding summer and Christmas and/or New Years’ holidays.
117Under the plan, Doug is to be responsible for both picking Devon up from and returning him back to West Virginia, including all costs he incurs for that purpose.
West Virginia is roughly 1,000 miles from Louisiana, or an 18-hour drive. While little evidence was introduced as to the exact amount of Doug’s salary, it is clearly not possible for Doug to be as actively involved in Devon’s schooling and activities as he has been. Doug will not realistically be able to fly to West Virginia to attend every school function, field trip, or t-ball game. Even if it were financially feasible, Doug is only allowed thirty hours of visitation per month, to be exercised only on Saturdays and Sundays, with exceptions for half of the summer and some holidays. The move will obviously greatly decrease both the frequency and the amount of time that Devon will see his father, as well as his paternal grandparents and other extended family. This factor weighs in favor of denying the relocation.

Factor U (The child’s preference, taking into consideration the child’s age and maturity level)

While we agree with the trial court that Devon is too young to testify before the court as to his preference, Elizabeth admitted that, if asked, Devon would say that he wanted to live with his father. Doug also testified that Devon would indicate a preference to live with him. Given the child’s young age, however, and the evidence that the child has a good relationship with and loves both of his parents, we find that this factor does not weigh heavily in favor of either party.

Factor 5 (Whether there is an established pattern of conduct of the parent seeking the relocation, either to promote or thwart the relationship of the child and the non-relocating party)

11sUnder this factor, we must determine whether it is likely, based on the past pattern of conduct, that Elizabeth will promote or thwart Devon’s relationship with his father. The testimony adduced at trial indicates that while living in Lafayette, Elizabeth refused to disclose to Doug that Devon was attending the “Years to Grow” daycare. Again, after Elizabeth moved Devon to West Virginia, and Devon was enrolled in “Sunbeam” daycare, she refused to disclose that information to Doug. And yet a third time, when Elizabeth enrolled Devon in his current West Virginia school, St. Francis, she refused to tell Doug the name of the school. When questioned about these instances, Elizabeth responded that she “felt like it really wasn’t any of his business. And the reason is[,] is because he wasn’t helping with the money of daycare.... ” She stated further that ‘Well, since you don’t pay for — for the daycare I’m not telling you.” However, when questioned by the attorney as to whether Doug was paying his child support obligation, Elizabeth admitted, “That’s right.”
Moreover, when enrolling Devon in “Sunbeam,” Elizabeth did not provide Doug’s name and contact information to the facility. Instead, she provided the name and contact information for her husband, Devon’s step-father.
Doug also alleged that Elizabeth refused to allow Devon to be baptized, and that he cannot have Devon baptized without his mother’s consent. Elizabeth responded, stating that she had no objection to having Devon baptized, but that she wanted Devon baptized in her church. However, no evidence was introduced and she did not *358 state that she had had the child baptized in her church.
Further, Doug testified that despite the interim judgment which ordered that he be allowed to call Devon every other day between 4:00 p.m. |19and 5:00 p.m., Elizabeth frequently would not answer his calls or return his messages. Doug testified that he would call all three numbers provided to him by Elizabeth and also send a text message, but that she would not allow Devon to phone him back, and when she did, it would be at around 7:30 p.m. when she knew he was working.
Finally, Elizabeth spent most of her testimony detailing past alleged acts of drug use or violence on the part of Doug. She stated in her testimony that Devon’s grandparents are “just like him” and that “I don’t feel that I can trust them. I don’t feel that I can believe anything that they say. They are very manipulative.” And while she made allegations about Doug’s past, the testimony reveals that she, too, engaged in promiscuity, the use of vulgar language, illegal drug use, and other criminal conduct. Furthermore, Elizabeth’s testimony at the hearing was impeached on numerous occasions. While we find that any alleged acts of the past are irrelevant to this proceeding, insofar as neither party presented any evidence that those alleged acts were detrimental to Devon, we take note of Elizabeth’s exhibited hostility towards Doug and his parents and are concerned about the likelihood that she will attempt to thwart Doug’s relationship with Devon. This factor weighs in favor of denying the relocation.

Factor 6 (Whether the relocation of the child will enhance the general quality of life for both the custodial parent seeking the relocation and the child, including but not limited to financial or emotional benefit or educational opportunity)

As the relocating parent, Elizabeth has the burden of proof to show that the child will derive a benefit, either directly or indirectly, from the move. The testimony of the witnesses evidences that Devon has suitable housing in both locations. Tim and Elizabeth live in a two-bedroom, two-bathroom townhome in a nice community in Fairmont, West Virginia. The ^community has an Olympic-sized pool, tennis courts, and a basketball court. We take note, however, that Elizabeth also has her two older sons in the summertime and on some holidays and that Tim has two older children that would presumably sometimes visit, although as of the time of this hearing, Tim’s children had not yet been to West Virginia. It is unclear as to whether the two-bedroom home would sufficiently accommodate all five children in the event that situation arises. Elizabeth testified that Devon has also developed friendships in West Virginia.
Doug lives with his parents in a three-bedroom, two-bathroom brick home'in a nice neighborhood in Houma. Doug does not have any other children to accommodate at any time during the year. Devon also has friends in the neighborhood and, according to his grandfather, is the “king of the hill.”
No evidence was introduced to indicate the superiority of either St. Francis, the private school Devon attends while in West Virginia, or Mulberry Elementary, the public school Devon attends in Houma.
Presumably, Devon could derive a benefit from the increase in the Tim’s salary. However, without any evidence as to the amount that Tim earned in Louisiana, we cannot calculate the amount of his salary increase. Tim testified that he now earns $110,000 per year. There was no evidence of his earning potential in Louisiana as compared to West Virginia. Neither did Elizabeth allege that she was unable to obtain employment in Louisiana. Notably, *359 her career as a secretary is not specialized or localized such that she is unable to work in Louisiana. And according to the evidence introduced at the motion for new trial, subsequent to the hearing, Elizabeth was no longer working. While we find that Elizabeth’s quality of life would obviously be enhanced by the move inasmuch as she understandably wants to live with Liher husband, we do not find that she has met her burden of proving an enhancement of Devon’s general quality of life. Therefore, this factor weighs against allowing the relocation.

Factor 7 (The reasons for the each parent in seeking or opposing the relocation)

As discussed above, the record provides a basis for finding that Elizabeth’s request to relocate was made in good faith, since she moved due to her husband’s transfer. However, that good faith may not extend to Tim’s acceptance of a subsequent position with a different company in the absence of some evidence that he attempted to find employment in Louisiana, closer to Devon’s family support system.
Doug’s opposition to the move is well-founded. He loves his son and has enjoyed and actively participated in his son’s life thus far. He wants to maintain that close relationship and remain actively involved in his son’s life, as well as allow his son to maintain a meaningful relationship with his numerous other relatives in Louisiana.
Considering the above, we find that this factor may weigh slightly in favor of Doug. Factor 8 (The current employment and economic circumstances of each parent and whether or not the proposed relocation is necessary to improve the circumstances of the parent seeking relocation of the child)
Doug is a registered nurse employed at a rehabilitation facility in New Orleans, Louisiana. He works nights for one week, and is off for one week. He testified that he makes between $36.00 and $41.00 per hour, depending on the pay differential. He pays his child support obligation, although no evidence is found in the record that indicates the exact amount of that obligation.
IsaElizabeth did not graduate high school. During and after her pregnancy with Devon she worked as a cashier at Stage Department Store. She testified that she quit that position because she married Tim and he told her that she did not need to work.
Within the three years prior to this hearing, Elizabeth received her, General Equivalency Diploma. She worked at The Wood Group as a secretary until the facility was shut down. There is no evidence that she obtained or looked for employment here in Louisiana prior to her move to West Virginia. Once in West Virginia, she again took a secretarial position with Stone Energy, a company that also has offices in Louisiana. She earned $35,000 per year. However, between the time of the hearing and the filing of the motion for new trial, for reasons that are unclear from the record, she again became unemployed.
The move to West Virginia was not for the purpose of Elizabeth obtaining employment, but rather for her husband to maintain his position. Apparently, whether Elizabeth works outside of the home is optional for them. Elizabeth did not make the argument that it was necessary for her to move to West Virginia to find work. We find that Elizabeth, as the relocating parent, failed to meet her burden in proving that the proposed relocation was necessary to improve her circumstances. This factor, therefore, weighs against allowing the relocation.

*360
Factor 9 (The extent to which the objecting parent has fulfilled his or her financial obligations to the parent seeking relocation, including child support, spousal support, and community property obligations)

The testimony indicates that Doug has always timely paid his child support obligation. Moreover, no argument was made and no judgment is | Mfound in the record holding Doug in contempt for his failure to timely pay his child support obligation. Factor 10 (The feasibility of a relocation by the objecting parent)
Doug was born and raised in and around Houma, Louisiana. His parents live in Houma and most of his extended family members also live in Houma. He has a very close relationship with his parents. He works as a registered nurse at a rehabilitation hospital in New Orleans, Louisiana. While we could speculate that Doug could likely obtain employment in West Virginia, he does not wish to leave his family, consisting of his parents and nearly 90 other relatives all living in or around Houma. We conclude that it is not feasible for him to relocate. See Johnson v. Spurlock, 07-949 (La.App. 5 Cir. 5/27/08), 986 So.2d 724, writ denied, 08-1400 (La.7/25/08), 986 So.2d 670.

Factor 11 (Any history of substance abuse or violence by either parent, including a consideration of the severity of such conduct and the failure or success of any attempts at rehabilitation)

Both parties in this case admit to past substance abuse. Both parties also allege violence on the part of the other during their relationship, more than five years ago. While Elizabeth focuses most of her testimony on describing past alleged instances of substance abuse and violence on the part of Doug, all of the instances alleged occurred prior to Devon’s birth and Elizabeth’s subsequent voluntary consent agreement, wherein she agreed to share physical custody of Devon with Doug on an equal basis. Therefore, even if those allegations were taken as true, Elizabeth’s actions suggest that she obviously does not view Doug as a threat to Devon and feels that Doug is capable of earing for Devon. There are no allegations of any new acts of substance abuse or violence against either party that would possibly give rise [¾⅛ a material change in circumstances warranting a change of custody on that basis. Since the birth of their son, who is now more than six years old, neither party appears to have had any continued struggles with drug abuse or displays of violence. Rather, it is apparent that Elizabeth’s attempt to change the custody plan of Devon stems only from her desire to move to West Virginia with her husband. We find that this factor does not weigh heavily in favor of either party.

Factor 12 (Any other factors affecting the best interest of the child)

We do not find any other factors affecting Devon’s best interest that need be considered here. We find that all other relevant factors are fully and adequately addressed in the following discussion of the suggested best interest factors of LSA-C.C. art. 134.
C. Other Suggested Factors
As provided by LSA-C.C. art. 134, some factors the court can consider when determining custody of a child may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, *361 clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
1 ¡⅞(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
Most of the considerations raised by Article 134 have already been discussed under our analysis of the enumerated factors of required of LSA-R.S. 9:355, et seq. However, a few of the suggested considerations of Article 134 were not, which we now address.

Factors 1, 2, & 3 (The love, affection, and other emotional ties between each party and the child, the capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child, and the capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.)

In its decision to allow Devon to move to West Virginia with his mother, the trial court placed much weight on its determination that Elizabeth would be available for Devon “essentially all of the time,” and that Doug would not. However, the evidence establishes that Doug is as available as Elizabeth, if not more. The evidence shows that while Doug works a week on/ week off schedule, he is able to take Devon to school every day, even when he is working. And while Elizabeth places a great deal of emphasis on the fact that Doug’s parents are required to care for Devon for approximately three of Devon’s waking hours each day during the week that Doug is working, the record establishes that Elizabeth at times also requires the assistance of her husband in caring for Devon. Nevertheless, the ^testimony and evidence reveals that Devon has a loving relationship with his grandparents, that they are capable of lending a helping hand, and that they are happy to do so.

Factors k & 5 (The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment, and the permanence, as a family unit, of the existing or proposed custodial home or homes.)

While Doug has lived his entire life in one state, Elizabeth has not. She was born in Seoul, Korea and lived there until the age of four, when she was adopted by the Donalds and moved to California. From California, she moved with the Don-alds to Louisiana, where she has lived in Morgan City, Lafayette, Broussard, Youngsville, and Houma. Since she and her husband have moved to West Virginia, she has moved at least once more, from Pleasant Valley to Fairmont, West Virginia.
Doug and Devon both have strong family ties to Louisiana as their home. Doug was born and raised by his parents in *362 Houma. Approximately ninety-one relatives of Devon live in or around the Houma area. Devon was born in Lafayette and has spent half of his life either in Lafayette or Houma, until his mother decided to move to West Virginia. Devon has thus enjoyed a stable and supportive environment in Louisiana and it would seem desirable to maintain the continuity of this environment and the permanence of the family unit, especially considering his many relatives nearby,
We conclude that Elizabeth did not meet the burden of proof required of her, as the relocating parent, by LSA-R.S. 9:355, et seq. to show that the relocation of Devon to West Virginia was in his best interest. Taking that into consideration along with our finding that Doug is more likely to provide Devon with a stable and permanent residence here in Louisiana, and that Doug is just as available for Devon as Elizabeth, with regards to custody, we |27must also then conclude that Doug should be granted domiciliary status. The parties shall maintain joint custody of Devon,[3] and visitation is awarded in favor of Elizabeth, as opposed to Doug, pursuant to the joint custody plan confected by the trial court at the hearing in this matter. Stated differently, the custody plan in this matter is reversed, such that the visitation schedule previously awarded to Doug is now awarded to Elizabeth, as Doug is now the domiciliary parent.
CONCLUSION
For the reasons assigned herein, the judgment of the 32nd Judicial District Court is reversed and judgment is rendered awarding the parties joint custody of the minor child, Devon Bryce Trahan. Doug is designated the domiciliary parent of Devon, subject to the right of Elizabeth to visit with Devon in accordance with the Joint Custody Plan attached hereto and made a part of this judgment. The attached custody plan, which is essentially an inverted version of the prior custody plan of the trial court, replaces in its entirety all previous custody implementation plans. All costs of this appeal are assessed to the appellee, Elizabeth Kingrey Romero.
REVERSED AND RENDERED.

. Devon awakes at 7 a.m. with his grandparents, but Doug does not arrive home, when working, until 8 a.m. In the evening, when working, Doug leaves at 6 p.m. and Devon is put to sleep by his grandparents at 8 p.m.

. Epi-pen is the brand name of the most common type of autoinjector of epinephrine (i.e. adrenaline.) Because they can be self-administered and are very fast-acting, Epi-pens are commonly carried by persons with severe allergies and a risk of anaphylactic shock.

. The transcript of the hearing evidences that the parties did not dispute that the continuation of joint custody of Devon remained in the child's best interest even though the parties now live in separate states. We agree and will not disturb that portion of the judgment.