STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2023 CU 0945

JOHN PICKNEY MORGAN

VERSUS

FELICIANA LOPEZ MORGAN

Judgment Rendered: __APR 1 9 2024__

* * * * *

Appealed from the
21st Judicial District Court
Parish of Livingston, State of Louisiana
No. 168457

The Honorable Jeffery T. Oglesbee, Judge Presiding

* * * * *

| | |
|---|---|
| Adam John Verret<br>Baton Rouge, Louisiana | Attorney for Plaintiff/Appellant,<br>John Pickney Morgan |
| | |
| Jenel Guidry Secrease<br>Ponchatoula, Louisiana | Attorney for Defendant/Appellee,<br>Feliciana Lopez Morgan |

* * * * *

BEFORE: WELCH, WOLFE, AND STROMBERG, JJ.

**WOLFE, J.**

The father appeals a judgment of the trial court that modified the previously entered custody judgment to name the mother, who lives in the Philippines, the domiciliary parent, denied his cross motion to modify custody, held the father in contempt, and denied his motion for new trial and alternate motion to modify spousal support. We affirm.

## FACTS

John Pickney Morgan is a domiciliary of the State of Louisiana and Feliciana Lopez Morgan is a domiciliary of the Philippines. They married on April 7, 2002, in Livingston Parish, then lived in both Louisiana and the Philippines. Two children were born of the marriage—one who is now a major, and MJ.L.M.,[1] who was born in the Philippines on October 2, 2010. Both children hold dual citizenship in the United States and the Philippines. The parties raised the children in the Philippines until early 2020, when John returned to Louisiana with the children for the stated purpose of renewing their United States passports. Feliciana remained in the Philippines. Soon thereafter, travel restrictions were imposed as a result of the COVID-19 pandemic. Since the children remained in Louisiana, Feliciana agreed that they should be enrolled in school in Louisiana.

In October 2020, John instituted this suit against Feliciana, seeking a divorce and joint custody of the children. He requested that he be named the domiciliary parent as he was the only parent living in the United States. He further requested an order prohibiting Feliciana from taking the children outside of the United States while exercising custody, alleging it would be impossible to force Feliciana to return them. In response, Feliciana asserted a reconventional demand, seeking joint

---

[1] Pursuant to Uniform Rules—Courts of Appeal, Rule 5-2, we refer to the minor child by her initials. In this case, the minor child shares the same initials with her older sibling. Thus, we refer to the minor child herein as "MJ.L.M."

2

custody of the children, partition of community property, and spousal support. The judgment of divorce was signed on April 21, 2021.

In July 2021, the trial court conducted an evidentiary hearing on issues of child custody and spousal support. It was established that Feliciana had not physically seen the children since they left the Philippines, and that Feliciana could not travel to the United States because her visa was expired and she lacked other required immigration documentation. In his memorandum filed in advance of the hearing, John argued that it was in the best interest of the children that they remain in the United States while either parent exercised custody, citing the cost and length of travel to the Philippines, as well as the high risk of kidnapping, high crime, and rampant corruption in the Philippines, as evidenced in a 2020 Human Rights Report. At the hearing, John introduced a copy of the Human Rights Report into evidence. Feliciana introduced a printout from the United States Department of State's website that listed treaties and other international agreements between the United States and the Philippines.

After the hearing, the trial court rendered judgment awarding Feliciana interim spousal support in the amount of $3,000.00 per month. The trial court additionally ordered John to assist with any immigration paperwork necessary for Feliciana to travel to the United States. The trial court took the child custody matters under advisement to allow the parties to file post-trial memoranda addressing "the issue of child abduction and the [Philippines] as a signatory to the [Hague] Convention ... and ...[the ability to enforce] Louisiana judgments regarding custody and custodial schedules." Days later, Feliciana filed a rule for contempt, alleging that John had failed to make any spousal support payments. She subsequently filed a motion to set final spousal support.

After receiving post-trial memoranda from both parties on the specified international custody issues, the trial court rendered judgment on October 28, 2021,

3

awarding the parties joint legal custody of MJ.L.M., with John named the domiciliary parent. The trial court awarded Feliciana periods of physical custody during the summer, while MJ.L.M. was out of school, specifying that those "periods of physical custody may take place in the country of the Philippines, or any other location which may be agreed to by the parties," with costs of travel shared equally between the parties. The trial court's judgment additionally stated that Feliciana was permitted additional custodial time in the United States upon reasonable notice to John.

The trial court's accompanying written reasons for judgment explained that at the hearing, John acknowledged that the parties had been raising the children in the Philippines until their separation. The written reasons set forth that John testified that he and the children returned to the United States in March 2020, with the intention that the children would travel back to the Philippines in June; however, as a result of the COVID-19 pandemic, the children enrolled in school in Livingston Parish. As a result of travel complications associated with the COVID-19 pandemic, Feliciana had not physically seen the children since March 2020, although she had daily video calls with them. The trial court acknowledged John's fears about allowing the children to travel to the Philippines and stated that, in making its determination of the best interest of the child, it carefully considered the testimony and evidence submitted, the applicable law, the parties' post-hearing briefs, and the relevant factors set forth in La. Civ. Code art. 134.

In June 2022, Feliciana again filed a rule for contempt, contending that John had not paid any spousal support, that it did not appear John was "doing his portion on reinstating her passport so that she [could] travel to the United States," and that John was ignoring her inquiries about MJ.L.M. spending the summer in the Philippines for Feliciana's physical custody period. In response to the rule for contempt and Feliciana's request for final spousal support, John asserted an

4

exception of no cause of action, with an incorporated motion seeking to hold Feliciana in contempt. As to Feliciana's contempt claims relative to custody, John contended that Feliciana had misstated and misinterpreted the language of the custody judgment. Specifically, John argued that the judgment's provision that Feliciana's periods of physical custody of the child "may" take place in the Philippines was only *permissive* and did not *require* him to allow MJ.L.M. to travel there. As to spousal support, John contended that Feliciana's claim for interim spousal support had terminated by operation of law and that their valid and enforceable prenuptial agreement precluded an award of final spousal support.

A hearing on the rule for contempt as to custody was held on September 6, 2022. At its conclusion, the trial court found that John was in contempt and ordered him to pay $1,500.00 in attorney fees to Feliciana's attorney. The trial court ordered John to present MJ.L.M.'s passport to the court on or before October 5, 2022, or provide a letter from a valid agency explaining why MJ.L.M. did not have a valid passport that would allow MJ.L.M. to travel to the Philippines. The trial court further decreed that MJ.L.M. would spend the entire Christmas holiday in the Philippines with Feliciana, at John's expense. The trial court's judgment specifically provided that if John did not send MJ.L.M. to the Philippines for Christmas, then a custody modification would be considered.

On October 5, 2022, the trial court held a hearing on issues related to spousal support. Considering the testimony and evidence presented, the trial court signed a judgment on October 19, 2022, that denied John's exception of no cause of action, incorporated motion for contempt, and request for specific enforcement of the prenuptial agreement. The trial court further determined that Feliciana was free from fault in the break-up of the marriage and in need of support, which John had the ability to pay. Therefore, the trial court ordered John to pay Feliciana $3,000.00 monthly in final spousal support for a period of three years. With regard to

MJ.L.M.'s passport, John explained that the renewal would take another seven to ten weeks.

Later in October 2022, John filed a motion seeking to modify child custody, establish child support, for contempt, for relief under the Uniform International Child Abduction Prevention Act "(UICAPA)," and requested an injunction against mandated international travel. In addition to reiterating his concerns about the inability to enforce an order to return MJ.L.M. from the Philippines, John asserted that Feliciana had made "concerning statements" that he interpreted as threats to keep MJ.L.M. in the Philippines and "demonstrated an increasingly brazen disregard of any legal consequences imposable by a U.S. or Louisiana court." John further accused Feliciana of providing false testimony at previous hearings. In setting the matter for hearing, the trial court summarily denied the requested injunction against international travel.

John also filed a motion for new trial with regard to the trial court's October 19, 2022 judgment on the issues of final spousal support, claiming it was contrary to law because no income had been imputed to Feliciana. John additionally based his motion for new trial on evidence of Feliciana's income that she had not previously disclosed. Alternatively, John sought a modification of support owed due to a material change in circumstances based on the newly discovered evidence of Feliciana's income.

MJ.L.M. did not spend the 2022 Christmas holiday in the Philippines. As a result, Feliciana filed a rule for contempt and to modify custody, pointing out that she had not seen her minor child in almost three years. She asserted that John's refusal to abide by the trial court's orders, even after being found in contempt, evidenced his inability to co-parent and amounted to parental alienation. She further asserted that John's actions in "[s]ecreting the child from her mother [were] causing the child irreparable harm."

6

After several continuances, the trial court held an evidentiary hearing on March 24, 2023, where it took up all of the matters pending between the parties except those related to community property. At its conclusion, the trial court held John in contempt of court and found that John's actions warranted a change of custody. The trial court observed that there had been numerous hearings in this case and that it had rendered a considered decree awarding the parties joint custody with John named domiciliary parent, which it believed was in MJ.L.M.'s best interest and recognized the geographic realities of John living in Livingston Parish and Feliciana living in the Philippines. The trial court stated that it was extraordinarily disturbed that, since this litigation began, neither of the children had obtained a valid passport from the United States or the Philippines that would allow them to travel. The trial court concluded it was evident that John would not comply with the court's orders regarding Feliciana's custodial time and had effectively prevented Feliciana from seeing her children for more than three years. The trial court further concluded that John's actions since the July 2021 custody trial constituted a material change in circumstances and that continuation of the existing custody arrangement would be deleterious to MJ.L.M.

Accordingly, the trial court modified the joint custody arrangement by designating Feliciana the domiciliary parent effective June 1, 2023. The trial court specified that under the new custody arrangement, MJ.L.M. would attend school in the Philippines and John would have custodial time during summer vacation. The trial court clarified that John could also visit MJ.L.M. in the Philippines anytime he chose to travel there, upon prior notice to Feliciana. John's cross-motion to modify custody, establish child support, and for relief under UICAPA was denied.

Additionally, as a result of the contempt ruling, the trial court ordered John to pay $1,500.00 in attorney fees and to serve fifteen days in jail, which could be purged upon proof that MJ.L.M.'s passport was renewed. The trial court denied John's

7

motion for new trial as to spousal support and alternative motion to modify the amount of support due.

John now appeals.

## CONTEMPT

In two assignments of error, John contends the trial court erred in holding him in contempt of court for failing to procure a passport for MJ.L.M. and for failing to facilitate MJ.L.M.'s travel to the Philippines. John's argument as to the failure to facilitate travel is based on his interpretation of the trial court's original October 28, 2021 custody judgment, which awarded Feliciana physical custody during MJ.L.M.'s summer vacation and provided that those periods of physical custody "may" take place in the Philippines. However, the record reflects that it was the trial court's October 19, 2022 judgment that held John in contempt in that regard. That contempt judgment was not timely appealed and is now final. In the same judgment, the trial court ordered John to send MJ.L.M. to the Philippines to spend her Christmas holiday with Feliciana. When that did not happen, Feliciana filed a second rule for contempt, which resulted in the April 26, 2023 judgment that is before this court on appeal. Since the October 19, 2022 judgment is not reviewable in connection with this appeal, we do not address John's arguments about the proper interpretation of the original custody judgment's language and focus our review solely on the second contempt finding reflected in the April 26, 2023 judgment.

A contempt of court is any act or omission tending to obstruct or interfere with the orderly administration of justice, or to impair the dignity of the court or respect for its authority. La. Code Civ. P. art. 221. Willful disobedience of any lawful judgment, order, mandate, writ, or process of the court constitutes a constructive contempt of court. La. Code Civ. P. art. 224(2). To find a person guilty of constructive contempt, the court must find that he violated the order of the court intentionally, knowingly, and purposely, without justifiable excuse. **Hagen v.**

8

**Hagen**, 2023-0242 (La. App. 1st Cir. 9/15/23), 376 So.3d 159, 166. If the person is found guilty of contempt, the court shall render an order reciting the facts constituting the contempt, adjudging the person charged with contempt guilty thereof, and specifying the punishment imposed. La. Code Civ. P. art. 225(B). The punishment that a court may impose upon a person adjudged guilty of contempt of court is provided in La. R.S. 13:4611, and includes the potential for both fines and periods of incarceration. La. Code Civ. P. art. 227.

In making its ruling, the trial court recalled that it first held John in contempt when MJ.L.M. failed to visit her mother during the summer of 2022. The trial court then ordered that MJ.L.M. spend the Christmas holiday with her mother. The trial court stated that on the deadline for John to provide MJ.L.M.'s passport or proof of why the passport had not been renewed (October 5, 2022), it was told the passport process would take another seven to ten weeks. The trial court explained that "[w]e just learned that in January 2023 [John] received notification that some additional steps needed to be done." However, seventy-three days later, those steps had not been taken and MJ.L.M. still did not have a valid passport.

At the March 24, 2023 hearing, John testified that his understanding was that MJ.L.M. would not be able to enter the United States with a Philippine passport unless it was accompanied by an American visa, and that she would similarly need a Philippine visa to enter the Philippines with an American passport.[2] Feliciana testified that she went to the passport center in the Philippines and was told that MJ.L.M.'s Philippine passport could not be renewed unless MJ.L.M. was physically present. She also stated that she had asked John "many times" to send her the child's original expired Philippine passport, but he had not done so.

---

[2] The record indicates that an expert in immigration law testified at the original custody hearing; however, a transcript of that proceeding is not part of the record on appeal.

John explained that "the proper way" to renew the child's American passport would be for the mother and father to present themselves with the child to the passport agency or post office. John testified that, after the court ordered him to renew MJ.L.M.'s passport, he went to the post office and was given a list of requirements for renewal. He introduced into evidence the form entitled "Statement of Consent: Issuance of a U.S. Passport to a Child" issued by the United States Department of State, which indicates it is to be used when the legal parent of a child under the age of sixteen cannot be present to apply with the child for a United States passport. Through his attorney, John sent the form to Feliciana. The form's instructions provide, "This form ... must be notarized."

Feliciana completed the form and had it notarized by an attorney in the Philippines on September 5, 2022. Feliciana sent the form by overnight mail to her attorney in the United States who is representing her in this proceeding. Feliciana's attorney forwarded the form to John's attorney and the form was submitted with MJ.L.M.'s passport application.

At the March 24, 2023 hearing, John's attorney asked Feliciana if it was true that MJ.L.M.'s passport application had been denied. After discussion by the attorneys, Feliciana denied ever being told that MJ.L.M.'s passport had been denied because the consent form she completed had not been notarized by the United States Embassy in the Philippines. She further denied being instructed that the form needed to be notarized by the United States Embassy, stating that the form itself indicated only that it had to be notarized. Feliciana testified that she received no communication from the United States Embassy, any passport office, her own attorney, or John's attorney that she needed to do anything further with regard to

10

MJ.L.M.'s passport application, despite having appeared for a January court proceeding.[3]

In his testimony, John confirmed that on approximately January 10, 2023, he received a letter from the United States Department of State dated January 4, 2023, addressed to MJ.L.M. at his home, which stated that additional information was needed to process the passport application. Specifically, the letter stated that a photocopy of the consenting parent's identification was not attached to the statement of consent and that the statement of consent itself was insufficient because it was not notarized by United States Embassy or consulate staff. The letter included a list of fifty-three countries from which "local notarization" by anyone other than the United States Embassy or consulate was not being accepted. The letter warned that if the requested information was not received within ninety days of the letter's date, then the passport application may be denied.

John testified that he provided the letter to his own attorney, but he did not provide the letter or share its content with Feliciana. He explained that he brought "that evidence" with him to the court's January 18, 2023 status conference conducted but "[n]obody ever asked" for it. The trial court asked John why, in the seventy-three days since the status conference, he had not inquired of his attorney or anyone else what needed to be done to get the child's passport. John responded that he thought he "went through appropriate channels" by handing the information over to his attorney rather than communicating it to Feliciana. In response to additional questioning by the trial court, John confirmed that MJ.L.M. still did not have a valid passport.

John's attorney added, "I think we've made it abundantly clear that my client is trying to prevent the child from going to the Philippines." When the trial court

---

[3] Feliciana appeared for all court proceedings via Zoom.

11

asked if he was acknowledging that John was in contempt of court, John's attorney answered "No" and attempted to clarify, stating, "we've made it clear that he desires not to send the child." The trial court agreed that John had made that abundantly clear.

When John was asked if MJ.L.M. could leave the next day for the Philippines if the trial court so ordered, John answered that MJ.L.M. could not because she did not have a passport. He was then asked if he would send MJ.L.M. to the Philippines if she did have a passport and he responded that he could not answer that "hypothetical" question. He stated, "that's a hypothetical situation because she can't leave."

On appeal, John contends that by holding him in contempt the trial court imposed what amounts to strict liability upon him for circumstances beyond his control. He argues that the record shows "the lengths he took to procure the child's passport" but contains no evidence that his failure to do so "was willful, intentional, or contumacious." We disagree.

The record overwhelmingly establishes that John has done everything possible to prevent MJ.L.M. from traveling to the Philippines as ordered by the trial court. The record further establishes that the passport renewal process requires John to renew the child's United States passport and that Feliciana cannot; however, John has willfully manipulated that process to avoid enforcement of the trial court's judgment. John admittedly had notice that MJ.L.M.'s United States passport would not be renewed without additional documentation from Feliciana but, with his attorney, failed to disclose that information to the trial court at a status conference and continued to withhold it until the date of the hearing. The trial court did not abuse its discretion in finding John in contempt of court for intentionally, knowingly, and willfully violating its judgment without justifiable excuse.

12

## CUSTODY

John next contends that the trial court erred in modifying custody to name Feliciana the domiciliary parent and in allowing relocation of the child to the Philippines, despite his request for relief under UICAPA.

Each child custody case must be viewed in light of its own particular set of facts and circumstances, with the paramount goal of reaching a decision that is in the best interest of the child. See La. Civ. Code art. 131; **McCormic v. Rider**, 2009-2584 (La. 2/12/10), 27 So.3d 277, 279. The purpose of every custody proceeding, including an action to change custody, is to ensure the child's emotional, physical, material, and social well-being. The court is obligated to protect the child from the harsh realities of the parents' often bitter, vengeful, and highly emotional conflict. See **Hodges v. Hodges**, 2015-0585 (La. 11/23/15), 181 So.3d 700, 702; **Jenkins v. Jenkins**, 2023-0087 (La. App. 1st Cir. 6/2/23), 370 So.3d 61, 71.

The burden of proof applicable a request to change legal or physical custody depends on whether the prior custody award was a considered decree, *i.e.*, an award made after the trial court received evidence of parental fitness to exercise care, custody, and control of the child. See **Mulkey v. Mulkey**, 2012-2709 (La. 5/7/13), 118 So.3d 357, 364; **Melton v. Johnson**, 2018-0403 (La. App. 1st Cir. 12/12/18), 2019 WL 4729852, *5. A parent seeking modification of a considered decree bears the heavy burden of proving that a change of circumstances has occurred, such that the continuation of the present custody arrangement is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely caused by a change of environment is substantially outweighed by its advantages to the child. **Bergeron v. Bergeron**, 492 So.2d 1193, 1200 (La. 1986); **Elliott v. Elliott**, 2010-0755 (La. App. 1st Cir. 9/10/10), 49 So.3d 407, 412, writ denied, 2010-2260 (La. 10/27/10), 48 So.3d 1088. In contrast, a parent seeking modification of a non-considered decree need only prove that there

13

has been a change in circumstances materially affecting the welfare of the child since the prior custody decree and that the proposed modification is in the best interest of the child. **Evans v. Lungrin**, 97-0541 (La. 2/6/98), 708 So.2d 731, 738; **Jenkins**, 370 So.3d at 72-73.

The trial court is in the best position to ascertain the best interest of the child in light of the unique circumstances of the case. **Jenkins**, 370 So.3d at 74. The trial court's determination in child custody matters is entitled to great weight and its discretion will not be disturbed on review in the absence of a clear showing of abuse. **Mulkey**, 118 So.3d at 368. In most child custody cases, the trial court's determination is based heavily on factual findings. **Jenkins**, 370 So.3d at 74. It is well-settled that an appellate court cannot set aside a trial court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. See **Kinnett v. Kinnett**, 2020-01134 (La. 10/10/21), 332 So.3d 1149, 1154. A court of appeal cannot simply substitute its own findings for that of the trial court. **Mulkey**, 118 So.3d at 368.

Here, the trial court correctly applied the **Bergeron** standard to the cross-motions to modify the previously entered considered custody decree. The trial court determined that John's contemptuous refusal to comply with its orders over the course of this litigation constituted a change in circumstances materially affecting the welfare of the child. We find no error in that determination. Louisiana law specifically recognizes that a pattern of willful and intentional violation of a custody or visitation order without good cause may be grounds for or constitute a material change in circumstances warranting modification of an existing custody or visitation order. See La R.S. 9:346(H) and 13:4611(1)(f). The record amply establishes that such is the case here.

In addition to not seeing MJ.L.M. in person for three years, Feliciana testified that she had only limited communication with her child. She stated that they spoke

on Feliciana's birthday in March, but since then, she had not "heard anything from them." She explained that she believed John blocked her number so that she could not reach him on his land line or cell phone and that her only communication with John was through the Our Family Wizard program.[4] She testified that her communication with MJ.L.M. was also limited. Feliciana acknowledged that MJ.L.M. had a cell phone and that text messages were sometimes exchanged; however, Feliciana speculated that John sometimes took the phone and responded as MJ.L.M. Feliciana described additional communication with MJ.L.M. through a messenger app and occasional brief video calls that lasted less than fifteen minutes.

John testified that after MJ.L.M. began seeing a therapist at the court's direction, he asked the therapist if he should make MJ.L.M. call Feliciana. He said the therapist suggested setting a specific time of day for MJ.L.M. to call. He set the time for when MJ.L.M. got home from school, which he noted was convenient for MJ.L.M., but because of the time difference, was at 3:00 a.m. for Feliciana. He later stated that Feliciana refused to set aside a specific time for the calls. John further stated that he takes MJ.L.M.'s phone from her every night at approximately 7:00 p.m. because she needed to get up for school the next day. He denied having the phone's password or pushing MJ.L.M. to divulge any communications with her mother.

John additionally testified that he explained to MJ.L.M. his belief that if she went to the Philippines, then her mother would not allow her to return to the United States. He could not recall if he advised Feliciana about certain activities MJ.L.M.

---

[4] John's attorney asked her to confirm that there was an absolute prohibition against the parties communicating with each other except through the program, which led the trial court to question where that prohibition was set forth in the judgment. Feliciana's attorney responded that it was not in the judgment. John's attorney stated that he understood that the parties were ordered to communicate through the program, which he typically interpreted as an absolute prohibition against other forms of communication. The trial court clarified that it ordered use of the program as a tool but did not prohibit other communication.

15

was involved in, such as a talent show. When asked what he had told Feliciana about, he stated that when he responded to anything Feliciana said through Our Family Wizard, Feliciana made derogatory remarks.

While some of the time apart was due to the COVID-19 pandemic, the trial court further found that John's actions in preventing MJ.L.M. from seeing her mother thereafter were so deleterious to MJ.L.M. that modification of the custody arrangement was required. Again, we find no error in the trial court's determination in that regard and conclusion that the **Bergeron** standard was satisfied with regard to Feliciana's motion to modify custody. [5]

As a result of its findings, the trial court modified the custodial arrangement to name Feliciana the domiciliary parent and ordered that MJ.L.M. would spend the school year in the Philippines with Feliciana and the summers in Louisiana with John. On appeal, John contends that the trial court erred in doing so because the issue of relocation was not properly pled. We find that this argument is absolutely without merit. Every aspect of this case has addressed the reality that Feliciana lives in the Philippines and cannot enter the United States. We agree with the trial court that Feliciana's request to modify custody to designate her the domiciliary parent necessarily included a request to relocate MJ.L.M. to the Philippines.

John next contends that the evidence presented at trial does not support relocation of the child to the Philippines. John argues that the trial court effectively extradited MJ.L.M. to a second-world country that is not a Hague Convention

---

[5] John argues that a party's contemptuous behavior alone does not create a basis for modification of a considered decree, citing **Gray v. Gray**, 2011-548 (La. 7/1/11), 65 So.3d 1247. In **Gray**, the Louisiana Supreme Court held that La. R.S. 9:355.11 of the relocation statutes, which provides that moving without a court or order or moving in violation of a court order may constitute a change of circumstances warranting a modification of custody, did not create an exception to the **Bergeron** standard. **Gray**, 65 So.3d at 1259. The Court then concluded that under the facts of that case, there was no showing that the unauthorized relocation of the child to Kansas from Alabama materially affected the child's well-being *or interfered with visitation*. **Gray**, 65 So.3d at 1260. The case *sub judice* is factually and legally distinguishable. La. R.S. 9:355.11 is not at issue. Moreover, it has been shown that John's behavior isolated MJ.L.M. from her mother. Under these circumstances, the **Bergeron** standard was satisfied.

signatory based solely on its finding that he was in contempt, without consideration of the relocation factors required by La. R.S. 9:355.14.

We reiterate that in every child custody case, custody must be awarded in the best interest of the child. La. Civ. Code art. 131; **Bergeron**, 492 So.2d at 1201. La. Civ. Code art. 134(A) directs courts to consider all relevant factors in determining the best interest of the child, which may include:

(1) The potential for the child to be abused, as defined by Children's Code Article 603, which shall be the primary consideration.

(2) The love, affection, and other emotional ties between each party and the child.

(3) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.

(4) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.

(5) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(6) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(7) The moral fitness of each party, insofar as it affects the welfare of the child.

(8) The history of substance abuse, violence, or criminal activity of any party.

(9) The mental and physical health of each party. Evidence that an abused parent suffers from the effects of past abuse by the other parent shall not be grounds for denying that parent custody.

(10) The home, school, and community history of the child.

(11) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(12) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party, except when objectively substantial evidence of specific abusive, reckless, or illegal conduct has caused one party to have reasonable concerns for the child's safety or well-being while in the care of the other party.

17

(13) The distance between the respective residences of the parties.

(14) The responsibility for the care and rearing of the child previously exercised by each party.

The weight to be given each factor is left to the discretion of the trial court. The trial court is not bound to make a mechanical evaluation of or provide a literal articulation of all of the factors and is not required to specifically explain its weighing and balancing of the factors. Rather, the trial court should decide each case on its own facts and circumstances in light of Article 134 and other relevant factors. **Couvillon v. Couvillon**, 2023-0056 (La. App. 1st Cir. 8/29/23), 2023 WL 5542771, *3 (unpublished).

When the practical effect of a custody judgment is the relocation of the child, the trial court must additionally consider the relocation factors set forth in La. R.S. 9:355, *et seq*. **Trahan v. Kingrey**, 2011-1900 (La. App. 1st Cir. 5/4/12), 98 So.3d 347, 351, writ denied, 2012-1586 (La. 8/1/12), 92 So.3d 351; **Bonnecarrere v. Bonnecarrere**, 2011-0061 (La. App. 1st Cir. 7/1/11), 69 So.3d 1225, 1233; see also **Ramirez v. Hite**, 2015-1179 (La. App. 1st Cir. 12/13/15), 2015 WL 9466920, *4 (unpublished). As it applies to child custody, "relocation" includes an attempt to change the location previously designated by the court as the child's primary residence to a location outside of Louisiana, irrespective of the geographic location of the parents. See La. R.S. 9:355.1 and 9:355.2(B)(1); **Nelson v. Land**, 2001-1073 (La. App. 1st Cir. 11/9/01), 818 So.2d 91, 93-94 (citing **Bullock v. Bullock**, 98-0206 (La. App. 4th Cir. 1/29/98), 706 So.2d 671, 672). When the relocation of the child's primary residence is contested, La. R.S. 9:355.10 requires that the proponent of relocation prove that the proposed relocation is made in good faith and in the best interest of the child. Thus, Louisiana's relocation statutes retain the best interest of the child standard as the fundamental principle governing decisions made pursuant

18

to its provisions. **Bridges v. Bridges**, 2020-0300 (La. App. 1st Cir. 11/10/20), 316 So.3d 17, 24.

Specifically, La. R.S. 9:355.14(A) provides:

In reaching its decision regarding a proposed relocation the court shall consider all relevant factors in determining whether relocation is in the best interest of the child, including the following:

(1) The nature, quality, extent of involvement, and duration of the relationship of the child with the person proposing relocation and with the non-relocating person, siblings, and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child, and the likely impact the relocation will have on the child's physical, educational, and emotional development.

(3) The feasibility of preserving a good relationship between the non-relocating person and the child through suitable physical custody or visitation arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's views about the proposed relocation, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct by either the person seeking or the person opposing the relocation, either to promote or thwart the relationship of the child and the other party.

(6) How the relocation of the child will affect the general quality of life for the child, including but not limited to financial or emotional benefit and educational opportunity.

(7) The reasons of each person for seeking or opposing the relocation.

(8) The current employment and economic circumstances of each person and how the proposed relocation may affect the circumstances of the child.

(9) The extent to which the objecting person has fulfilled his financial obligations to the person seeking relocation, including child support, spousal support, and community property, and alimentary obligations.

(10) The feasibility of a relocation by the objecting person.

(11) Any history of substance abuse, harassment, or violence by either the person seeking or the person opposing relocation, including a consideration of the severity of the conduct and the failure of any attempts at rehabilitation.

19

(12) Any other factors affecting the best interest of the child.

Although La. R.S. 9:355.14(A) requires the trial court to consider all twelve factors in a relocation case, it is not necessary that the trial court expressly analyze each factor in its oral or written reasons for judgment and its failure to do so does not constitute an error of law. **Gray v. Gray**, 2011-548 (La. 7/1/11), 65 So.3d 1247, 1255; **State v. Titus**, 2018-1511 (La. App. 1st Cir. 2/28/19), 274 So.3d 591, 600. Ultimately, the question to be determined by the appellate court on review is whether the trial court, having properly considered all of the factors in La. R.S. 9:355.12, abused its discretion in determining that the relocation would be in the child's best interest. **Gray**, 65 So.3d at 1255.

After careful review, we find that the trial court sufficiently considered all relevant factors in making its determination that it is in MJ.L.M.'s best interest that custody be modified to name Feliciana the domiciliary parent, meaning that MJ.L.M. will primarily reside in the Philippines. This entire custody litigation has focused on the amount of time MJ.L.M. should spend in the Philippines with Feliciana. While John now vehemently objects to MJ.L.M. traveling to the Philippines at all, it is undisputed that the Philippines was MJ.L.M.'s home from the time of her birth until John effectively relocated her to the United States in 2020. In the Philippines, MJ.L.M. attended a private Catholic school where she did well, had friends, and lived near her large extended family. Feliciana testified that upon her return, MJ.L.M. would attend the same school and live in the same home in which she was raised. Again, this case is not a typical request for relocation; rather, it is a request to return MJ.L.M. to what was her home for the majority of her life. In light of the trial court's findings that John's actions constitute a change in circumstances materially affecting MJ.L.M.'s welfare and that continuation of the present custody arrangement (*i.e.*, living primarily in the United States with John) is so deleterious to MJ.L.M. as to justify a modification of the custody decree, and considering the

20

relevant factors for relocation and the best interest of the child, we find no error in the trial court's determination that it is in MJ.L.M.'s best interest to modify the prior custody decree to name Feliciana the domiciliary parent.

John argues, however, that UICAPA, set forth in La. R.S. 13:1851 *et seq.*, should be enforced and any travel by MJ.L.M. to the Philippines should be permanently enjoined. UICAPA authorizes courts to take abduction prevention measures if there is a credible risk of abduction of the child, as determined by enumerated factors and evidence presented by the parties. See La. R.S. 13:1857 and 13:1858-1859. One factor to be considered is whether the child will travel to a country that is not a signatory to the Hague Convention. See La. R.S. 13:1857(A)(8)(a).

In response to John's request for relief under UICAPA, the trial court summarily denied his request for a preliminary injunction prohibiting international travel for MJ.L.M. At the March 24, 2023 hearing, when John's counsel asked questions about whether the Philippines was a signatory to the Hague Convention, the trial court ruled, "I've already heard this ... from prior counsel, and I had them brief the issue in a post[-]trial memorandum. So I am aware – I'm aware of that position."

Throughout this proceeding, John has asserted that Feliciana threatened to keep the children in the Philippines if they returned. At trial, he testified that Feliciana's threats against were evident in messages they exchanged through Our Family Wizard. As a specific example, John read Feliciana's message of February 27, 2022,[6] which stated:

> Mr. Morgan I haven't heard from [MJ.L.M.] for 4 days now! You took our children for 2 years now. Your [*sic*] so heartless. How can you sleep at night with what you did to me. You will answer everything to God. You took our children without my consent.

---

[6] John incorrectly identified the date of the message as February 22, 2022.

21

John explained that he knew this was a threat because he believed Feliciana could intercede in prayer. John also read Feliciana's next message, which stated, "You will pay to the Lord every tears [*sic*] drop." John stated he believed this showed Feliciana's state of mind was "that she's willing to maybe assist God in doing his job." John clarified that he did not feel threatened while in the United States, but he would feel threatened in the Philippines, which meant he could not help MJ.L.M. if she were there.

Feliciana denied that her messages were threats. At the conclusion of the hearing, the trial court denied John's request for relief under UICAPA.

The record establishes that John has raised the issue of MJ.L.M.'s safety in the Philippines since the start of this litigation. Further, the arguments that he now raises in support of his request for relief under UICAPA were before the trial court when it rendered its original custody judgment that permitted Feliciana to exercise custody of MJ.L.M. in the Philippines. That judgment was not appealed. The trial court rejected the arguments a second time in denying John's request for relief under UICAPA. Since a transcript of the original custody trial is not included in the appellate record, we cannot determine whether any new evidence relative to MJ.L.M.'s safety in the Philippines was adduced at the modification hearing. However, the trial court's judgment is presumed to be correct. **Miller v. Dicherry**, 2020-0365 (La. App. 1st Cir. 11/24/20), 316 So.3d 477, 480.

With regard to the conflicting testimony about whether Feliciana's messages to John should be interpreted as threats, the trial court was presented with a credibility determination and determined that Feliciana was more credible than John. When findings are based on determinations of credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the findings of the trier of fact. See **Hayes Fund for First United Methodist Church of Welsh, LLC v.**

22

**Kerr-McGee Rocky Mountain, LLC**, 2014-2592 (La. 12/8/15), 193 So.3d 1110, 1116.

Based on the appellate record before us and again noting that John and Feliciana raised their children in the Philippines for most of MJ.L.M.'s life, we find no error in the trial court's ruling.

## SUPPORT

In the same judgment that modified custody, the trial court denied John's motion for new trial as to spousal support and alternative motion for modification of spousal support due to an alleged material change in circumstances. On appeal, John contends the trial court erred in doing so.[7] He also contends the trial court erred in denying his motion for continuance as to these issues because Feliciana provided requested discovery only the day before.[8]

As is relevant here, a new trial shall be granted when the judgment appears clearly contrary to the law and the evidence or when the party has, since the trial, discovered evidence important to the case that he could not have obtained with due diligence before or during the trial. La. Code Civ. P. art. 1972. Additionally, a new trial may be granted in any case for good cause. See La. Code Civ. P. art. 1973. The trial court's discretion in ruling on a motion for new trial is great and its decision

---

[7] John's arguments are specific to the denial of the motion for new trial and do not evidence his intent to appeal the merits of the trial court's October 19, 2022 spousal support judgment. Compare **Reed v. Louisiana Horticulture Commission**, 2021-0657 (La. App. 1st Cir. 12/22/21), 341 So.3d 66, 68 n.2 (recognizing that where it is clear from the appellant's brief that he intended to appeal a judgment on the merits, along with a judgment denying a motion for new trial, an appellate court will consider the appeal to be an appeal of the judgment on the merits even though the notice of appeal only refers to the judgment denying the motion for new trial).

Additionally, although John's assignment of error purports to challenge the trial court's denial of his alternative motion to modify spousal support based on a material change in circumstances, that issue was not briefed. Thus, we consider it abandoned. See Uniform Rules—Courts of Appeal, Rule 2-12.4(B)(4).

[8] When an unrestricted appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory judgments prejudicial to him. **Samuel v. Harris**, 2021-1577 (La. App. 1st Cir. 6/3/22), 342 So.3d 1009, 1011 n.2.

will not be disturbed on appeal absent an abuse of that discretion. **Samuel v. Harris**, 2021-1577 (La. App. 1st Cir. 6/3/22), 342 So.3d 1009, 1011.

John's motion for new trial alleged that before the October 5, 2022 trial on spousal support, the trial court denied his motion to compel and continue that hearing "despite evidence and international investigative resources becoming available" as to Feliciana's earnings and income. According to John's motion, the trial court then declined to impute any income to Feliciana. The trial court's October 19, 2022 judgment awarded Feliciana $3,000 per month in final spousal support. John argued that a new trial was mandated because the judgment was clearly contrary to law since no income was imputed to Feliciana and because new evidence proved transfers to an account in Feliciana's name, which she failed to disclose in discovery and denied under oath. John further alleged that the discretionary grounds for new trial were satisfied due to Feliciana's "repeated and intentional acts of perjury under oath, denying facts that she should have admitted, [refusal] to produce records of the account said funds were transferred to, and [use of] the American Judiciary to arbitrarily harass, extort, and capriciously vex" him. Alternatively, he asserted that proof of the transfer of funds amounted to a material change of circumstance that warranted modification or termination of spousal support.

At the start of the March 24, 2023 hearing, John's counsel made an oral motion for continuance of the spousal support issues, contending that he had just received relevant discovery from Feliciana the day before. Feliciana's counsel admitted that some discovery was provided the day before, but contended it was only three pages that would have taken minimal time to review, and that John had continually argued that discovery responses were insufficient as a delay tactic. John's counsel countered that Feliciana continued to produce additional records after denying that any further records existed. He asserted that this was material to the

24

issue of whether MJ.L.M. should be relocated to the Philippines and "especially the immigration issue." The trial court summarily denied the motion to continue.

Proceeding with his motion for new trial, John then called Feliciana's nephew, Maxmar Saura, to testify. Saura described working for Feliciana and his observation of dirt operations on Feliciana's farm that involved several contractors. However, he also testified that Feliciana fired him the previous October, that she then pressed charges against him, and that he had no knowledge of her current financial situation, stating that he last went to Feliciana's house "a very long time ago." He additionally testified that since being fired, John, paid him a monthly allowance of 5,000 pesos but denied that John paid him for his testimony. In connection with Saura's testimony, John introduced a copy of a delivery receipt from a sand and gravel quarry dated October 12, 2022, which Saura identified as the receipt he received after "moving land" for Feliciana. Feliciana disputed Saura's testimony, stating, "He is making stories."

John's attorney questioned Feliciana about why she did not provide information about a particular bank account prior to the hearing on Feliciana's request for final spousal support. She explained that the account was opened on September 1, 2022, at Saura's request so that Saura could use her business name for an isolated contract. In connection with that testimony, John introduced a photocopy showing a mobile device accessing Feliciana's banking account that showed receipt of a transfer on October 24, 2022, in the amount of "PHP 102,600.00." Feliciana denied that this evidenced "a deal that [she] had been working [on] before the trial date," and accused Saura of illegally accessing her banking records. John suggested that this evidence conclusively proved that Feliciana failed to provide relevant financial information.

At the conclusion of the hearing, the trial court denied John's motion for new trial and alternative motion to modify spousal support due to a material change in

25

circumstances. After review, we find that the trial court did not abuse its discretion in so ruling. The record before us does not establish either mandatory or permissive grounds for a new trial. Saura's testimony was equivocal at best and was subject to the trial court's assessment of Saura's credibility. More importantly, the receipts and financial evidence that John introduced concern transactions that occurred after the October 5, 2022 hearing on spousal support. In light of this, we also find that the trial court did not err or abuse its discretion in denying John's motion to continue the hearing on these issues.

## CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed to the appellant, John Pickney Morgan.

**AFFIRMED.**